Robert A. RIDDELL, District Director of Internal Revenue, Los Angeles District, California, Appellant,

v.

M. Robert GUGGENHEIM, Jr., Appellee.

No. 16445.

United States Court of Appeals
Ninth Circuit.

Aug. 3, 1960.

Charles K. Rice, Asst. Atty. Gen., Lee
A. Jackson, Robert N. Anderson, Charles
B. E. Freeman, Attys., Dept. of Justice,

**838**

Washington, D. C., Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., for appellant.

Goodson & Hannam, Los Angeles, Cal., and Bruce I. Hochman, Beverly Hills, Cal., for appellee.

Before STEPHENS, BARNES and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is an appeal by the Director of Internal Revenue from a judgment of the United States District Court in favor of the taxpayer, M. Robert Guggenheim, Jr., in the latter's suit to recover a portion of the sum paid by him as income tax for the years 1954 and 1955.

Plaintiff's claim is that the twenty-four monthly payments made by him to Jean Guggenheim in the two taxable years mentioned were within the purview of those portions of 26 U.S.C.A. § 71(a) (1) and (2) and § 215 [1] that allow a deduction from gross income of periodic payments made by a taxpayer to his separated or divorced wife because of the marital or family relationship and the consequent general obligation to support such dependent.

Robert and Jean intermarried in 1950, but had separated and were living apart by March 9, 1953 when they entered into a written "Property Settlement Agreement"; shortly after the execution of that agreement Jean commenced an action for divorce in the State of California and was granted an interlocutory decree in April 1953 and a final decree on May 7, 1954; both decrees incorporated the property settlement agreement. The provision of that agreement under which the payments in question were made, reads:

"Husband agrees to pay to the Wife, as a further consideration for the execution of this agreement and as an integral part thereof, and by way of property settlement and not as alimony, the sum of Two hundred fifty Dollars ($250.00) a month, without interest, commencing the 15th day of March, 1953, and payable on the 15th day of each and every month thereafter for a total period of sixty (60) months, except that if the Wife should die or remarry at any time during the sixty (60) months, period, the unpaid balance shall be deemed discharged and no longer payable, and the Husband shall be released from any and all obligations to make said payments for the unexpired period of time."

The District Court, following a trial, found that the payments in question in fact constituted the periodic payments referred to in 26 U.S.C.A. § 71 and were in no wise a cash settlement made by Robert to Jean in lieu of a division of specific property or any property interests. This ultimate factual conclusion

---

1. These two sections, in pertinent part, read as follows:

"§ 215. Alimony, etc., payments.

"(a) General rule.—In case of a husband described in Section 71, there shall be allowed as a deduction (from his gross income) amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year."

"§ 71. Alimony and separate maintenance payments

"(a) General rule.—

"(1) Decree of Divorce or separate maintenance. If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments—received after such decree in discharge of * * * a legal obligation which because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

"(2) Written separation agreement. If a wife is separated from her husband and there is a written separation agreement executed after the date of the enactment of this title, the wife's gross income includes periodic payments * * * received after the agreement is executed which are made under such agreement and because of the marital or family relationship * * *. This paragraph shall not apply if the husband and wife make a single return jointly."

("[T]he date of the enactment of this title," referred to in section a(2), was August 16, 1954.)

was based upon the several intermediate findings that:

"5. Said payments of Two Hundred Fifty ($250.00) Dollars per month for sixty (60) months, but to terminate on the death or remarriage of Jean O'Donnell Guggenheim, were labeled by the parties to said Property Settlement Agreement as property settlement and not as alimony. However, such payments were, in reality, intended by both parties to be for the support and maintenance of the wife and not for any property interest surrendered by the wife.

"6. The wife, Jean O'Donnell Guggenheim, did not actually surrender any property interests in consideration of Plaintiff's [i. e. Robert's] promise to pay the Two Hundred Fifty ($250.00) Dollars per month for sixty (60) months, to terminate, however, on death or remarriage of the wife.

"7. The entire community property of the husband and wife at the time of such agreement was less than Three Thousand ($3,000.00) Dollars.

"8. Such community property as may have existed at the time of such Property Settlement Agreement was divided equally by the other provisions of the Property Settlement Agreement."

At the trial considerable evidentiary attention was devoted to the issue of intention; Jean and Robert both gave direct testimony on that subject, but each flatly contradicted the other: on the one hand Jean declared that the above-quoted passage in the agreement stating that payments were to be "by way of property settlement and not as alimony * * *" fully and correctly expressed the parties' intention, while Robert on the other hand stated that it did not, but that this designation was made at his insistence to forestall subsequent increases in alimony payments if the agreement was incorporated into the divorce decree and thus subject to future modification by the court.[2]

Jean particularly testified that she had had an interest in certain silverware reasonably valued at from $25,000 to $35,000 which she stated Robert's family had given to both spouses; her attorney testified that several items of community and other property were "in question" during the pre-agreement negotiations, including the silver, some household furniture, bank accounts and "various things." Robert, however, claiming Jean's testimony was totally unfounded, asserted that the silverware had been given to him alone, part before and part during his marriage to Jean.

We are thus confronted with an emphatic written agreement containing a plain declaration of intention together with apparently credible corroborating testimony of several witnesses, opposed simply by the testimony of Robert that the agreement did not mean what it said.

██ Although the temptation is strong to give little weight to Robert's self-serving oral testimony, our primary concern is with the evidence in support of the finding of intention as well as all other findings, and our review is controlled by the rule that they cannot be set aside unless "clearly erroneous," with due regard for "the opportunity of the trial court to judge the credibility of the witnesses." Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A.

██ If the only evidence presented were that stated above, the clearly erroneous rule would require us to accept the lower court's finding of intention since it is based upon conflicting oral testimony

2. The record reveals the parties were mindful of the rule as expressed in decisions such as McClure v. McClure, 1935, 4 Cal.2d 356, 49 P.2d 584, 100 A.L.R. 1257, which held that where a decree of divorce when entered makes no provision for alimony, the court has no jurisdiction thereafter to modify the decree in that respect. See also, Calif. Civil Code, § 139; Howell v. Howell, 1894, 104 Cal. 45, 37 P. 770; Dexter v. Dexter, 1954, 42 Cal.2d 36, 265 P.2d 873.

**840**

and hence the credibility of witnesses. The agreement itself is not altogether clear; it unequivocally declares that the payments in question are by way of property settlement and not as alimony, but nevertheless ceases those payments upon the death or remarriage of the wife. Such ambivalent provisions, especially in determining income tax liability, required the lower court to consider oral evidence of the parties' intention in drawing up the agreement. Landa v. C. I. R., 1953, 92 U.S.App.D.C. 196, 206 F.2d 431; Thorsness v. United States, 7 Cir., 1958, 260 F.2d 341.

We are therefore not faced with the situation presented in United States v. U. S. Gypsum, 1948, 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746, where the government had clearly established its case by documentary evidence showing a plan or conspiracy to violate the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, but the lower court found otherwise based upon testimony of the authors of the documents in question. The Supreme Court, in rejecting the finding, stated: "[w]here such testimony is in conflict with contemporaneous documents we can give it little weight * * *." In the present case, the agreement, as documentary evidence, did not establish the character of the payments because it was, by its terms, equivocal; the oral evidence was necessary to show its real purpose and the lower court's reliance or implicit belief in Robert's testimony would therefore be entitled to considerable weight under the "clearly erroneous" rule.

Yet this does not end the matter; aside from the direct testimony of the parties' intention, there was considerable other evidence, upon which all the above-quoted findings were made, also bearing on intention. The lower court found that Jean gave up no property interests in return for the monthly payments, that the community property did not exceed $3,000.00, and that the community property was divided equally. If these findings are supported by the evidence, neither the preliminary finding of intention nor the ultimate conclusion that the pay-ments were alimony, could be called "clearly erroneous." If they are not supported, however, and if in fact there was an unequal division of community property in which Jean relinquished her interests in return for monthly payments, we would be faced with the same situation that existed in the Gypsum case.

For the court's finding of intention, if contradicted by the agreement, by oral evidence and by other factual realities clearly showing a mutual exchange of community property for monthly payments, would then be clearly erroneous; the testimony of Robert, under such circumstances, could be given little weight. See Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537. It would also follow that the lower court's ultimate factual conclusion, based upon Robert's favored testimony, was wholly without support in the record, and we would be "left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum, supra, 333 U.S. at page 395, 68 S.Ct. at page 542.

This brings us, then, to a consideration of the findings that the wife surrendered no property interest in return for the sum to be paid her under the agreement, that the community property did not exceed $3,000.00, and that the community property was divided equally. If supported by the record, they would clearly be consistent with the declared intention of the taxpayer and thus, all findings taken as a whole would amply support the ultimate conclusions of the lower court that the payments were alimony.

Preliminarily, we note that the agreement itself did not specify the values of any of the property described therein, nor was evidence on the question adduced in the trial court except as to some items claimed by the husband as his separate property. Yet the lower court found that the community property was divided equally and did not exceed $3,000.00. Although we are unable to see how the court could have reached such conclusions when the record is barren of any evidence showing values of this property, it is clear that the bulk of the property must

have been treated as the separate property of the husband, leaving only a relatively small amount of community assets which were actually divided.[3] Thus, if the record shows that the community property was divided equally, and the wife relinquished no separate property in return for the monthly payments, it follows that she gave up nothing in the agreement and the payments could only be in discharge of the marital obligation, i. e., alimony.

The record, however, contains evidence only as to the character of three of the several kinds of property mentioned in agreement: (1) household furniture, (2) wedding gifts, and (3) insurance policies. In this regard the taxpayer testified that the furniture was owned by him before the marriage and that some of the "wedding gifts" were given in a previous marriage, while others had been gained by him individually both before and after his marriage to Jean; the agreement itself contains the recital that all the premiums on the life insurance policies had been paid from separate funds of the husband.

■■ The character of such property is a question of local law, and since this matter arose in California, we look to the laws of that state. Helvering v. Fuller, 1940, 310 U.S. 69, 60 S.Ct. 784, 84 L.Ed. 1082; United States v. Akin, 10 Cir., 1957, 248 F.2d 742; United States v. Stewart, 9 Cir., 1959, 270 F.2d 894. Under California law, property owned by the husband before marriage and that acquired afterwards by gift or with the proceeds of separate property is separate property. Calif.Civil Code, § 163; Manshel v. Manshel, 1953, 120 Cal.App.2d 806, 262 P.2d 60; United States v. Brown, D.C.S.D.Cal.1952, 110 F.Supp. 370.

■ Thus, there was credible proof that the furniture and "wedding gifts" constituted the separate property of the husband. The same is true of the insurance policies, for the entire interest in a policy of insurance upon which the premiums are paid by the named insured from his separate funds is separate property in which the community has no interest.[4] In re Allie's Estate, 1958, 50 Cal.2d 794, 329 P.2d 903; New York Life Ins. Co. v. Bank of Italy, 1923, 60 Cal.App. 602, 214 P. 61.

■ However, accepting these items as separate property of the taxpayer, there are still several other items included in the agreement—two automobiles, jewelry, clothing, and bank accounts—which must also be considered.

---

3. The agreement divides the following property between the husband and wife, respectively:

"Husband
1. Houshold furniture, furnishings and equipment.
2. 1952 Cadillac 4-door Sedan, Model 62.
3. Such wedding gifts designated to be the property of each as per a list initialed by the parties.
(No such list was ever prepared or agreed upon.)
4. Separate bank accounts of each spouse.
5. Three insurance policies totalling in face amount, $72,581.00.
Wife
1. 1950 Chevrolet convertible coupe.
2. All jewelry, clothing and personal effects of the Wife, including one lounge chair.
3. Wedding gifts, as in No. 3 above.
4. Bank accounts, as in No. 4 above."

4. Although the agreement states that the policies were acquired with separate funds of the husband, Robert testified that during the years 1951 and 1952, when he was still married to Jean, the only "savings" he acquired were those put into the insurance policies, at the rate of approximately $1,000.00 per year. If the premiums were paid out of Robert's community earnings, of course, the community would have a proportionate interest in the policies to the extent that premiums were paid from community funds. United States v. Stewart, 9 Cir., 1959, 270 F.2d 894; In re Allie's Estate, 1958, 50 Cal.2d 794, 329 P.2d 903. We assume for present purposes that the premiums were not paid out of Robert's community earnings but from his separate funds, making the entire interest in the policies his separate property.

From the record before us, these were all apparently acquired during the marriage and thus presumptively were community property of both Robert and Jean. Melny v. Melny, 1949, 90 Cal.App.2d 672, 203 P.2d 588; Estate of Durham, 1951, 108 Cal.App.2d 154, 238 P.2d 1061.

There is no evidence apparent to us which would rebut this presumption, nor is there evidence showing who owned the bank accounts and the amounts deposited therein, or the value of the jewelry, automobiles, and clothing. In short, there is no evidence which would support a finding that the value of the community property was less than $3,000.00, and similarly, that the property was divided equally; without such evidence, it is impossible to support the further finding that the wife did not relinquish any property interest in return for the monthly payments.

The record before us is therefore insufficient to support a finding that the parties intended the payments as alimony and that they were in fact made in discharge of a legal obligation arising out of the marital relationship. Evidence concerning the nature, amount, and proportionate share of the property divided might reveal that Jean Guggenheim did in fact relinquish some property rights, thus negativing an intention that the payments were to constitute alimony and indicating that they were, at least in part, a settlement of property interests. The judgment must therefore be reversed and the case remanded for further proceedings.

There remains one further point raised by the Director of Internal Revenue involving a pure question of law which should be settled for the trial court in the event the same result is reached after the remand. The question presented is whether the payments, even though constituting alimony, made under the agreement prior to the final divorce decree are deductible by the appellee in any event under 26 U.S.C.A. § 215(a).

As noted earlier, the agreement was entered into between the taxpayer and his then wife in March, 1953; an interlocutory decree of divorce was entered in favor of the wife by the Superior Court of California in April of that year, and the final decree on May 7, 1954. Concededly the taxpayer made four monthly payments in 1954 prior to entry of the final divorce decree, but after the interlocutory decree was rendered. The District Director argues that since the marriage was not finally dissolved when these payments were made, they are not includible in the wife's gross income and cannot be deducted from the husband's gross income under the statutory scheme provided by 26 U.S.C.A. §§ 71(a) (1) and 215(a).

Where an interlocutory decree does not operate to dissolve the marriage under state law the spouses have generally been treated as still married for tax purposes as well. Thus, during this period the parties may file joint income tax returns. C. I. R. v. Ostler, 9 Cir., 1956, 237 F.2d 501; C. I. R. v. Eccles, 4 Cir., 1953, 208 F.2d 796. Payments made to the wife pursuant to an award of alimony pendente lite are not includible in her gross income. Wick v. Commissioner, 7 T.C. 723, affirmed 3 Cir., 1947, 161 F.2d 732; Tressler v. C. I. R., 9 Cir., 1955, 228 F.2d 356; Richardson v. C. I. R., 4 Cir., 1956, 234 F.2d 248. Also, we note that the 10th Circuit has held that any payments made by a husband to his wife under a mere interlocutory decree are similarly not includible in her gross income. C. I. R. v. Evans, 10 Cir., 1954, 211 F.2d 378; see also, Calhoun v. C. I. R., 1956, 27 T.C. 115.

The first question here, then, is the effect of an interlocutory decree upon the marital status in California. California law provides that an interlocutory decree does not dissolve the marriage but amounts to no more than a judicial declaration that a party is entitled to a

divorce.[5] In re Estate of Seiler, 1912, 164 Cal. 181, 128 P. 334; the dissolution occurs only upon the entry of the final decree. Calif.Civil Code, §§ 132, 133; Olson v. Superior Ct., 1917, 175 Cal. 250, 165 P. 706, 1 A.L.R. 1589; In re Estate of Dargie, 1912, 162 Cal. 51, 121 P. 320; Harrold v. Harrold, 1954, 127 Cal.App.2d 582, 274 P.2d 183. Since the interlocutory decree does not effect a dissolution of the marriage in California, the four payments made by Robert here during that period are not included in the wife's income and hence not deductible from his income.

However, the taxpayer argues that this rule should not be applied where, as here, the husband and wife are living apart and file separate income tax returns, for by so doing they have indicated their intention to perfect the divorce and thus render the payments taxable to the wife rather than the husband.

This argument has been accorded some recognition in Revenue Ruling 57–368, 1957–2 C.B. 896 (1956), but in absence of legislative approval we see no reason for departing from the rule expressed in C. I. R. v. Evans, supra. The various aspects of the marital status are determined solely by state law, and the requirement that a certain period of time must elapse before the union may be terminated rests upon strong policy considerations, including that of giving estranged spouses opportunities to become reconciled. Grannis v. Superior Court, 1905, 146 Cal. 245, 79 P. 891; McGuiness v. Superior Court, 1925, 196 Cal. 222, 237 P. 42, 40 A.L.R. 1110; Annotation 62 A.L.R.2d 1262, 1265. If the marriage is not dissolved by an interlocutory decree under state law, we think this is determinative of the question under Section 71(a) (1). Congress could have easily included as a deduction from gross income of the husband payments made to his spouse pursuant to an "interlocutory decree;" it did not do so, and without such legislative expression, we think that the payments made under an interlocutory decree may not be included in the wife's income nor be deducted by the husband from his gross income for tax purposes.

■ The taxpayer also urges that we sustain the allowance of the deduction under 26 U.S.C.A. § 71(a) (2), dealing with written separation agreements not incidental to a divorce decree. Under that section the inclusion of periodic payments in the wife's income, and hence the right of the husband to deduct such payments from his own income, is rendered inapplicable " * * * if the husband and wife make a single return jointly." By filing joint or separate returns, the parties themselves can effectively determine which spouse will be required to pay the income tax on the payments. This provision clearly has no application here, for it is expressly limited to a " * * * written separation agreement executed after the date of the enactment of this title * * *." That date was August 16, 1954; this agreement was executed in March 1953.

We conclude, therefore, that the four payments made in 1954 by the taxpayer prior to the final divorce decree are not deductible under the terms of 26 U.S. C.A. § 215(a) and § 71(a) (1).

*Judgment reversed and case remanded for further proceedings in accordance with this opinion.*

---

5. It is true that an interlocutory decree becomes res judicata as to all questions determined by the trial court after the decree is no longer open to attack by a motion for a new trial or appeal or other forms of relief; this finality includes such questions as a determination of property rights between the spouses and the adjudication of which spouse is entitled to the divorce, still leaving the court free, however, to modify its orders regarding the payment of alimony. Dupont v. Dupont, 1935, 4 Cal.2d 227, 48 P.2d 677; Harrold v. Harrold, 1954, 127 Cal.App.2d 582, 274 P.2d 183.