JOHN H. SCHACHT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ELIZABETH LYLE SCHACHT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2126–65, 2127–65. Filed February 28, 1967.

*Harry L. Freeman,* for the petitioner in docket No. 2126–65.

*Bruce M. Casey, Jr.,* and *Marvin M. Grove,* for the petitioner in docket No. 2127–65.

*Roger A. Pott,* for the respondent.

BRUCE, *Judge:* Respondent determined a deficiency in income tax for the calendar year 1959 against each of the petitioners, who were formerly husband and wife, as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 2126–65 | John H. Schacht | $27,989.00 |
| 2127–65 | Elizabeth Lyle Schacht | 27,880.83 |

The cases were consolidated on motion of Elizabeth Lyle Schacht. The sole issue is whether an amount paid to Elizabeth with respect to a sale of shares of stock was taxable income to John H. Schacht or to Elizabeth Lyle Schacht.

The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner John H. Schacht, hereinafter referred to as John, filed his 1959 income tax return with the Office of International Operations, Field Operations Branch, Washington, D.C.

Petitioner Elizabeth Lyle Schacht, hereinafter referred to as Elizabeth, filed her 1959 income tax return with the district director of internal revenue, San Francisco, Calif.

John and Elizabeth were married in California in 1928 and remained residents of California until April 30, 1959, or later.

In 1952 John entered into the television broadcasting business as a shareholder, officer, and employee of Sacramento Telecasters, Inc., a California corporation, hereinafter referred to as Telecasters.

During 1952 the commissioner of corporations of the State of California issued a permit to Telecasters, authorizing the issuance of one-tenth share of stock to John for every nine-tenths share sold to others. Pursuant to such permit, and before October 1958, John received 486 1/12 shares of stock in Telecasters in consideration for his promotional services to that corporation. The shares were issued on the condition that they would not participate in dividends or upon liquidation, and could not be sold until the Federal Communications Commission issued a broadcasting license to Telecasters.

Because of the above-mentioned restrictions and limitations, the 486 1/12 shares, herein sometimes referred to as promotional shares, had no readily ascertainable market value upon receipt, and the shares were not reported in John's income tax returns for the periods in which they were received.

John also purchased before 1958 266 1/4 shares of the common stock of Telecasters for the amount of $26,624.96.

Early in 1958 John and Elizabeth separated and agreed to live apart.

On October 29, 1958, John and Elizabeth entered into a written property settlement agreement. The agreement did not mention in any way the 486 1/12 shares of Telecasters received by John for his promotional services. There was no other agreement respecting property between the parties, either oral or in writing.

The agreement was approved on November 7, 1958, by a judge of the Superior Court of California. It provided in part:

Husband and Wife desire by this agreement to settle and determine, as between themselves, their respective property rights, including their rights to community property, and to provide for the support and maintenance of Wife.

It Is Mutually Agreed between the parties hereto as follows:

1. Husband and Wife have the following separate and community property:

554

(a) 266¼ shares of the common stock of Sacramento Telecasters, Inc. issued in the name of Husband. * * *

[Here the agreement describes two automobiles, certain contracts, household furniture and furnishings, and seven life insurance policies.]

2. Husband hereby warrants that he is not now possessed of any property whatsoever other than the property hereinbefore specifically listed in the preceding paragraph hereof and that he has not made, without the consent and knowledge of Wife, any gift or transfer of any community property.

That if it shall hereafter be determined by any court that Husband is now possessed of any property not hereinabove set forth, or that he has made without the consent of Wife any gift or transfer of community property, Husband shall pay to Wife on demand a sum equal to one-half of the fair market value of said property.

\* \* \* \* \* \* \*

5. That Husband and Wife, because of the commingling by them of their respective separate and community properties, agreed that a fair division between them of their community property is provided by the terms of this paragraph, as follows:

(a) Husband hereby transfers and assigns unto Wife, as between the parties hereto, thirty-six and one-half (36½) per cent of the common stock of said Sacramento Telecasters, Inc., standing in his name, being thirty-six and one-half (36½) per cent of 266¼ shares of said stock, as her sole and separate property, together with all of the household furniture and furnishings, and all of the interest of Husband in said 1958 Plymouth Belvedere sedan automobile hereinbefore mentioned.

Although, as between the parties, the transfer hereinbefore mentioned is an actual transfer of title to said stock, Husband may retain same in his name and treat and consider it as his own for the purpose of the pending deal for the sale of all of said stock to J. H. Whitney Company, its affiliates or associates, in order to simplify and facilitate the conclusion of said sale. In the event of the failure of said sale, for any reason, Husband shall cause said stock to be issued in the name of Wife and delivered to her; in the event of the death of Husband prior to consummation of said transaction, Wife shall be entitled to have said stock issued and delivered to her in her own name.

(b) That Wife does hereby transfer and surrender unto Husband, as his sole and separate property, any and all of her interest in and to 63½ per cent of said stock in said Sacramento Telecasters, Inc., being 63½ per cent of 266¼ shares of the common stock of said corporation.

\* \* \* \* \* \* \*

6. Wife hereby grants to Husband the option to purchase her shares in said Sacramento Telecasters, Inc., transferred to her hereunder, or to sell same for her account. The price to be paid to Wife by Husband shall be her prorata share of the proceeds received by Husband for all of said stock, including Wife's shares; provided, however, that said price shall be not less than the sum of ninety thousand (90,000) dollars, net, to Wife, after payment of her income taxes arising out of said sale. This option shall expire thirty (30) months after the execution of this agreement, in order to allow time for the completion of any litigation which might arise out of any contest of said sale. This option shall apply to any stock acquired as a result of the merger or consolidation of Sacramento Telecasters, Inc., with any other corporation.

7. That subsequent to the date of the separation of the parties, Husband has paid and agrees to continue to pay to Wife for her support and maintenance the sum of $375.00 per month on the 15th day of each and every month, in advance.

Husband shall be entitled to the dividends on the interest of Wife in said stock in said Sacramento Telecasters, Inc., transferred to Wife hereunder; provided, however, that in the event that the annual dividends on said stock shall exceed the sum of $4,500, Wife shall be entitled, in addition to said sum of $375.00 per month, to the amount of such excess in dividends, as and when said sums are paid as dividends on said stock, whether the said dividends be paid by said Sacramento Telecasters, Inc., or any successor thereto.

That the payments hereinbefore provided to be made by Husband shall be made by him during the life of Wife, or until she shall remarry, or until she shall have realized from the sale of her interest in said stock in said Sacramento Telecasters, Inc., or its successors, an amount of not less than the sum of $90,000 net to her. In the event of the death of Husband, his estate shall be liable to Wife for any and all amounts due from him hereunder, less any dividends paid on the stock of Sacramento Telecasters, Inc., and received by her.

On November 7, 1958, an interlocutory decree of divorce between John and Elizabeth was entered, which decree ordered the parties to perform according to the property settlement agreement.

On November 19, 1958, John executed a contract to sell all of his shares in Telecasters at a price of $953.56 per share, less certain closing expenses.

On or about April 10, 1959, the contract was consummated, and John received a net price of $850.69 per share, or a total of $717,394.97. Prior to the sale, Elizabeth learned that John was owner of additional shares not disclosed in the property settlement agreement.

On or about April 30, 1959, John met with Elizabeth and her attorney to carry out those provisions of the agreement concerning the sale of Telecasters shares. At this meeting John issued two checks to Elizabeth, both dated April 30, 1959, one in the sum of $100,000 and one in the sum of $21,921.88. Elizabeth executed on April 30, 1959, a receipt for $100,000 "in full settlement of community interest in stock of Sacramento Telecasters, Inc. as per agreement."

John caused the sale of 752⅓ shares on April 10, 1959, for gross proceeds of $717,394.97, which amount was reported on his 1959 income tax return as the gross sales price of a long-term capital gain. He subtracted from $717,394.97 the sum of $79,233.42 as expense of the sale, $26,625 denoted as "cost" and $121,921.88 denoted as "share paid to wife," and reported $489,614.67 as a capital gain.

On his 1959 return John attached an explanation of the transaction as follows:

A divorce agreement was made between my wife and me in Oct. 1958 giving her, among other things, a certain number of shares (under community property laws) of Sacramento Telecasters, Inc.

Before the shares were delivered to her, the prospect of a sale developed and I prevailed upon her and her attorney to keep the shares in my name until after the sale (if any) at which time I would give her the equivalent in cash, this was accepted with a one year limitation and with her getting the dividends (if any) during the interim. This act eliminated the possible long delay of ownership change through the F.C.C. and sped up the closing of the sale agreement.

The sale of stock in Sac. Tel. Inc. took place on April 10, 1959 and in the same month she received $121,921.88—her share of the proceeds which, broken down was $100,000.00 plus $21,921.88 for income tax as per the agreement.

On her 1959 income tax return Elizabeth did not report any part of the payments referred to above as taxable income to her.

In July 1962 Elizabeth filed a complaint for fraud, for money damages, and for declaratory relief against John in the Superior Court of the State of California in and for the City and County of San Francisco, based upon John's failure to disclose his possession of 486½ shares of Telecasters stock. The court entered a judgment in her favor in October 1964 wherein it was ordered that she have and recover from the defendant the principal sum of $216,753.10, with interest from the date of the judgment, together with costs.

Elizabeth realized long-term capital gain in 1959 in the amount of $121,921.88 from the sale of Telecasters stock. She did not sustain a loss by theft or otherwise in 1959 by reason of John's concealment of his ownership of additional shares.

John had no interest in the shares which he sold in 1959 for Elizabeth.

### OPINION

The principal issue is whether the amount of $121,921.88, paid by John to Elizabeth with respect to the sale of certain shares of stock, is taxable as income to John or to Elizabeth. Respondent, to protect the revenue, has determined a deficiency against each petitioner based upon the receipt of this amount as long-term capital gain, but concedes that only one of them is liable. The resolution of the issue depends upon the interpretation of the property settlement agreement of October 1958.

In the agreed division of the listed separate and community properties, the 266¼ shares of listed stock was apportioned 36½ percent to Elizabeth and 63½ percent to John. Other properties were allotted to one or the other of them. The agreement included assignments from each to the other to this effect. The proceeds in question were paid to Elizabeth with respect to the sale of the 36½ percent, amounting to 97.18 shares, transferred and assigned to Elizabeth as between the parties. The complication arises from the arrangement made to carry out a pending deal for the sale of all the stock to other parties. Elizabeth contends that John was acting in his own behalf in effecting this sale. John contends that he was acting as agent for Elizabeth in the sale of the 97.18 shares assigned to her in the agreement.

The agreement contained, in paragraph 6, an option to John to purchase the shares transferred to Elizabeth, or to sell them for her account, the price to be paid her to be her prorata share of the pro-

ceeds but not less than $90,000 net after payment of her income taxes arising out of the sale. Under paragraph 7 John agreed to make monthly payments to Elizabeth for support and maintenance. John was to be entitled to the dividends on Elizabeth's stock interest to the extent of $4,500 per year, the amount of the support payments. It was further provided that the support payments should be made "until she shall have realized from *the sale of her interest in said stock* * * * an amount of not less than the sum of $90,000 net to her."

Elizabeth contends that the amount paid to her by John in 1959, not the 97.18 shares of stock, constitutes nontaxable proceeds from the partition of the community property. The partition, however, occurred in 1958 when the petitioners agreed upon a division and assigned each to the other the shares and other items as apportioned in the agreement. This partition, as respondent concedes, was not taxable. See *Frances R. Walz, Administratrix*, 32 B.T.A. 718 (1935). The basis to Elizabeth of the 97.18 shares assigned to her was the basis or cost to the community of $100 per share. When the shares were sold for net proceeds of $850.69 per share in 1959, in accordance with the authorization contained in the agreement, taxable gain resulted.

Elizabeth contends that since John was entitled to keep the 97.18 shares in his name, sell them on such terms as were satisfactory to him, and to apply both dividends and sales proceeds in satisfaction or cancellation of his obligation to support, he was the legal owner at the time of sale and that she was not the beneficial owner, for he derived the benefit of terminating his obligation for support.

John did not have the right to sell her shares on terms satisfactory to him, as she alleges. His right was limited to one pending sale, and there was a minimum price to be paid by him to her as a condition to that sale. John had the option to purchase these shares from her or to sell them for her account, provided the price was met. She was the owner of the shares by virtue of the agreement. Either John purchased the shares from her at the price she required, in order to sell all the stock together, or he sold her shares, as her agent, along with his shares, and paid her price from the proceeds. In either interpretation she realized gain upon the sale of her stock, and it is taxable to her as determined by the respondent in her case. She realized at least $90,000 net from "the sale of her interest in said stock," as called for in the agreement.

It appears that her share of the proceeds computed at $850.69 per share for the 97.18 shares would amount to $82,670.05. John paid her $121,921.88, or some $39,000 more than the net amount he collected for her shares. Under the agreement he was to pay $4,500 per year to her for support, but if she realized $90,000 net "from the sale of her interest" in the stock, he could end the support payments. It was therefore to his advantage to see that she realized this amount. Also,

at the time of the payment she was aware of his ownership and sale of the shares he had concealed and he was aware of her claim for a part of the proceeds of these shares. We may presume that his payment of the additional amount was both in order to meet the conditions for terminating the support payments and in recognition.of her pending claim for some part of the proceeds of the concealed shares. However, there is no evidence to show that some part of the amount paid was in lieu of alimony or was received otherwise than as from the sale of her interest in the stock. Elizabeth has failed to meet the burden of proving error in the respondent's determination that the entire amount paid her was with respect to her stock interest and is taxable as long-term capital gain.

Elizabeth contends that the economic benefit to John from the sale of her shares was such as to make the gain on the sale taxable to him and not to her, citing *United States* v. *Davis*, 370 U.S. 65 (1962). That case involved a transfer by husband to wife of stock pursuant to a property settlement agreement prior to divorce. The stock transferred was the property of the husband and had appreciated in value. The Court held that the transfer was a taxable event and that the husband realized gain upon the transfer based upon the value of the stock at that time. The transfer was in settlement of property rights under the laws of Delaware.

Elizabeth contends that the payment here was in satisfaction of her right to alimony, and, under the rule of the *Davis* case, the receipt was not taxable to her.

The *Davis* case is not applicable here. It concerned rights under Delaware law, not community property rights. The shares assigned to Elizabeth were a part of her share of the community property, not property of her husband transferred in satisfaction of a right to alimony. When John either bought her shares or sold them for her account, she realized gain.

Elizabeth contends, further, that if the proceeds of the sale are gross income to her, not more than 10 percent of the gain thereon was taxable in the year 1959, under section 71(c) of the 1954 Code.[1] The argument is that under the agreement she was to receive either the

---

[1] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

    (a) GENERAL RULE.—

        (1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

        *        *        *        *        *        *        *

    (c) PRINCIPAL SUM PAID IN INSTALLMENTS.—

        (1) GENERAL RULE.—For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or

97.18 shares plus alimony until death or remarriage, or not less than $90,000, net to her, thus that there was a principal sum which might be paid over a period of more than 10 years, and section 71(c) limits the taxable amount in any 1 year to 10 percent of the principal sum. Section 71 does not apply here. The payment to her of the proceeds of the stock sale was in settlement of property rights pursuant to the agreement, not as a payment for support. The fact that the support payments were to terminate if and when she realized $90,000 net from the sale of her stock interest does not require the treatment of the proceeds as alimony or make section 71(c) applicable to those proceeds. *Campbell* v. *Lake*, 220 F. 2d 341 (C.A. 5, 1955) ; cf. *Riddell* v. *Guggenheim*, 281 F. 2d 836 (C.A. 9, 1960).

Elizabeth contends also that if the proceeds are taxable to her, her basis in the stock was $30,681.14 greater than the basis in respondent's computation, which was $9,718, or $100 per share for 97.18 shares. The argument is that she was entitled to one-half of the 266¼ shares described in the agreement, and that the fair market value of the shares she gave up should be added to her basis in computing the gain on her shares. We disagree. The property settlement agreement effected what the parties considered to be a fair division of all their property, and Elizabeth was not entitled to one-half of the 266¼ shares there allocated. She relinquished nothing for which she did not receive equal value in other property.

At the time of the property settlement agreement John concealed from Elizabeth and her counsel the fact that he owned another 486¹⁄₁₂ shares of stock of Telecasters, received for promotional services. He misrepresented the actual amount of stock held. In the agreement he warranted that he was not then possessed of any property whatsoever other than the property listed, and agreed that if it should thereafter be determined by any court that he was possessed of any such property he would pay her on demand a sum equal to one-half of the fair market value thereof. In years subsequent to the taxable year before us Elizabeth sued John and secured a judgment for damages on account of this concealment.

Elizabeth contends that her consent to the property settlement agreement was procured by fraud and that she sustained a theft loss

---

property, specified in the decree, instrument, or agreement shall not be treated as periodic payments.

(2) WHERE PERIOD FOR PAYMENT IS MORE THAN 10 YEARS.—If, by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received.

560

or loss by embezzlement in 1959 when John concealed the existence of the 486½₂ shares and appropriated them to his own use.

Elizabeth was aware of the concealment prior to the sale and prior to the meeting at which the payment was made to her. She accepted the payment and gave a receipt for $100,000. She did not then nor later repudiate the property settlement agreement on the ground of fraud, and, in fact, she relied upon its terms in her complaint filed against John in 1962.

Furthermore, she has not established that any such loss occurred in 1959. For the loss to be allowable there must be no reasonable expectation of recovery. Income Tax Regs., sec. 1.165–1(d)(2)(i). Elizabeth filed suit in 1962 and must have concluded that there was then a reasonable prospect of recovery.[2]

Moreover, if a loss did occur in 1959, Elizabeth has failed to show any basis in the promotional shares. Since they were for John's services, the basis to the community and to her is zero. The amount of any allowable loss as a deduction may not exceed the adjusted basis for the property. Income Tax Regs., sec. 1.165–1(c).

We hold that the amount of $121,921.88 paid Elizabeth upon the sale of her 97.18 shares of Telecasters stock is taxable to her as long-term capital gain in 1959 and is not taxable to John, and that Elizabeth is not entitled to a deduction in 1959 for theft or otherwise from the concealment by John of his ownership of additional shares.

Since other adjustments are involved,

*Decisions will be entered under Rule 50.*

---

[2] Counsel for Elizabeth have informed the Court that some amounts have been collected upon the judgment in 1966 subsequent to the hearing in this case.