PAUL J. CONDIT and PATRICIA CONDIT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Condit v. Commissioner
Docket No. 12067-77.
United States Tax Court
T.C. Memo 1980-536; 1980 Tax Ct. Memo LEXIS 46; 41 T.C.M. (CCH) 471; T.C.M. (RIA) 80536; December 4, 1980
Lyle Walker, for the petitioners. Douglas R. Fortney, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $ 51,054.26 in petitioners' Federal income tax for 1973. Because of concessions, the only remaining issue is whether petitioners suffered a deductible loss in 1973 when certain cotton allotments they had purchased were canceled by the Government. Findings of fact/ Some of the facts were stipulated and are found accordingly. This case was consolidated for trial only with Greaves v. Commissioner,T.C. Memo. 1980-535 (Dec. 4, 1980). At the time they filed their petition herein, petitioners Paul J. Condit and Patricia Condit, husband and *47 wife, resided in Seminole, Tex. Paul J. Condit, hereinafter "Petitioner," is a farmer. In 1973, petitioner was the owner-landlord of Three J Farms in Gaines County, Tex., on which upland cotton was grown for him by 5 tenants. During the spring of that year, petitioner purchased cotton acreage allotments for $ 57,095.10 from unrelated third parties and transferred them to Three J Farms. Based on these transferred allotments and the yield history of Three J Farms, petitioner's tenants became eligible for and received Government subsidy payments in 1973 totaling approximately $143,000. Upland cotton acreage allotments, discontinued after 1977, were part of the general scheme of the Agricultural Adjustment Act of 1938, 7 U.S.C. secs. 1281-1393 (1976). The purpose of the Agricultural Adjustment Act of 1938 is to ensure a reliable supply of cotton and other agricultural products. Under the Act, the Department of Agriculture maintains stable prices by imposing penalties limiting national production and maintains supplies by providing various forms of Federal farm subsidies. 7 U.S.C. secs. 1282, 1341 (1976). See generally Wickard v. Filburn,317 U.S. 111 (1942); *48 Fulford v. Forman,245 F.2d 145 (5th Cir. 1957); Smith v. Commissioner,55 T.C. 133 (1970). Acreage allotments generally allow the holder to market agricultural products without penalty. However, acreage allotments were not necessary to sell cotton in 1973; production limitations for upland cotton have not been in effect since 1970. Secs. 601-610, Agricultural Act of 1970, Pub. L. No. 91-524, 84 Stat. 1371; Sec. 1(19), Agriculture and Consumer Protection Act of 1973, Pub. L. No. 93-86, 87 Stat. 233; Sec. 601, Food and Agriculture Act of 1977, Pub. L. No. 95-113, 91 Stat. 933. However, cotton acreage allotments were still in effect in 1973 and entitled the holder to price-support payments for growing cotton, "set-aside" (soil conservation) payments for not growing cotton, and price-support loans. See generally Smith v. Commissioner,supra;Rev. Rul. 74-306, 1974-2 C.B. 58. For the years 1971 through 1977, the Secretary of Agriculture determined a national base acreage allotment for upland cotton, which was then apportioned among the states. 7 U.S.C. sec. 1350(a)-(b) (1976). Within each *49 state, the ASCS "state committee" and local "county committees" of the Agricultural Stablization and Conservation Service (hereinafter "ASCS") supervised apportionment of acreage allotments to individual farms. 7 C.F.R. sec. 722.803 (1974). In general, a farm's acreage allotment was based primarily on the allotment it had received for the previous year. 7 C.F.R. secs. 722.401 to.412 (1974). However cotton acreage allotments could also be bought and sold, subject to county committee approval. 7 U.S.C. sec. 1344b(a) (1976); 7 C.F.R. secs. 722.417 to.422 (1974). In 1973, Gaines County was the largest cotton producing county in the United States. 7 C.F.R. sec. 722.467(b)(2) (1974). For most of 1973, petitioner was chairman of the Gaines County ASCS county committee. However, on November 29, 1973, Deputy Administrator Clifton E. Adams (hereinafter "Adams") of the Department of Agriculture arrived from Washington, D.C., and suspended from office the entire county committee and the Gaines County ASCS office manager for hindering an ongoing investigation into 1973 cotton acreage allotment transfers. On December 6, 1973, petitioner and some 160 other area farmers *50 received notices from Adams, acting as the Gaines County ASCS office, canceling the transferred allotments they had purchased that spring. The gist of the letters was that improper farm combinations had misrepresented the transferee farms' productivity for the purpose of obtaining Federal subsidies. The letters demanded repayment of all cotton program payments for 1973 that had already been made on the transferred allotments. In petitioner's case, he was held jointly and severally liable with his tenants for about $143,000. Around $7.5 million was involved in all. At about the same time, petitioner was also threatened with criminal prosecution. On December 19, 1973, petitioner timely filed a notice of appeal with Adams, who was still acting as the Gaines County ASCS office and county committee. However, petitioner and his attorney did not really expect that Adams would change his mind, since he had canceled the allotments in the first place. Nor did petitioner's attorney expect to reverse the cancellations on appeal to the ASCS state committee, because the Washington lawyers who were advising Adams would also be advising the state committee. The primary purpose of the appeal *51 was to help petitioner contest the demand for refund. Petitioner also hoped, by steadfastly maintaining that the transfers had been proper, to avoid any criminal liability in the matter. As things turned out, petitioner's appraisal of his chances on appeal and of Adams's intransigence were substantially correct. On January 18, 1974, prior to any action on the appeal, petitioner received from the county committee 1974 acreage allotments of zero for Three J Farms. Hearings held with Adams failed to result in reinstatement of the canceled allotments. On March 29, 1974, the county committee did offer to reinstate partially petitioner's cotton allotments under a formula based on a number of production factors. The final figures were never computed, but the formula would not have resulted in any more than a 15 percent reinstatement. Petitioner, individually and by his lawyer, refused this offer in writing, taking an all or none position that the transfers had been proper. Petitioner would have had to accept the ffer within a reasonable period of time for it to have become effective. The Government did not try to force the offer on petitioner. Subsequently, petitioner twice failed *52 to reverse Adams's decision at the Texas ASCS state committee level. On December 3, 1974, petitioner received a final letter from the state committee informing him that no further action on his appeal was possible and that the matter was considered closed. Petitioner did, however, continue to resist the Government's demands for refund. He was eventually able to settle the refund claim, and he was never prosecuted criminally. In his statutory notice, respondent disallowed petitioner's 1973 deduction of the $ 57,095.10 he had spent for upland cotton acreage allotments. OPINION In 1973, petitioner purchased upland cotton acreage allotments entitling him and his tenant-farmers to various Federal support payments. The transfers were canceled in December 1973 by a Deputy Admdinistrator of the Agricultural Stablization and Conservation Service (ASCS), Department of Agriculture. Petitioner immediately appealed the cancellations in connection with other litigation contesting demands by the Government for the refund of certain subsidy payments and potential criminal liability. By December 1974, the avenues of appeal with respect to the allotment cancellations had been exhausted. *53 The Government's demands for refunds were settled sometime thereafter. The issue presented is whether petitioner suffered a deductible loss in 1973.
Section 165(a) and (c) [1] allows individuals to deduct losses incurred in a trade or business or in a transaction entered into for profit. In this case the loss, if any, was undoubtedly incurred in petitioner's trade or business. However, to be deductible a loss must be evidenced by a closed and completed transaction. Sec. 1.165-1(b) and (d), Income Tax Regs.; United States v. White Dental Co.,274 U.S. 398 (1927). The deduction is allowed only for uncompensated losses. Sec. 165(a). Thus, when the liability for a loss is being contested, or when there exists a claim for reimbursement, that portion of the loss which may be recovered is not deductible until the amount of the actual loss suffered is ascertainable with reasonable certainty. Sec. 1.165-1(d)(2)(i), Income Tax Regs. Legal action against an insurer or the party responsible for the loss will normally postpone deduction until the claim is *54 settled, adjudicated, or abandoned. See Lewellyn v. Elec. Reduction Co.,275 U.S. 243 (1927); Scofield's Estate v. Commissioner,266 F.2d 154 (6th Cir. 1959), affg. in part and revg. in part 25 T.C. 774 (1956); Schacht v. Commissioner,47 T.C. 552 (1967); Gale v. Commissioner,41 T.C. 269 (1963). Litigation with respect to a loss does not, however, invariably postpone the deduction. The regulations explicitly provide: Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. * * * [Sec. 1.165-1(d)(2)(i), Income Tax Regs.] The cases also hold that pending litigation does not postpone the deduction of a loss where there is no reasonable prospect of recovery. Rainbow Inn, Inc. v. Commissioner,433 F.2d 640 (3d Cir. 1970), revg. a Memorandum Opinion of this Court; Kugel v. Ryan,289 F.2d 329 (2d Cir. 1961) (taxpayer's chances in litigation a question of fact; summary judgment inappropriate); Commissioner v. Highway Trailer Co.,72 F.2d 913 (7th Cir. 1934), *55 revg. 28 B.T.A. 792 (1933). Thus, the narrow factual issue to be decided herein is whether, in 1973, petitioner had any reasonable chances of reversing Deputy Administrator Adams's 1973 cancellation of the cotton allotments petitioner had purchased. Respondent argues that no deduction is allowable for any year prior to 1977 because petitioner could at any time have accepted the ASCS offer to reinstate partially the canceled allotments. With respect to 1973, respondent argues that petitioner, by appealing the cancellation, demonstrated his belief that the allotments might eventually be reinstated. Petitioner argues that he knew his appeals had no chance of success and that, accordingly, he is entitled to a deduction for 1973. We find for petitioner.
Based on the entire record in this case, we are convinced that petitioner's administrative appeals had no reasonable prospect of success. The purpose of the appeals was not really to recover the $57,095.10 petitioner spent on the canceled allotments. Instead, petitioner hoped to avoid the more onerous burdens of potential criminal liability and of having to pay refunds of Federal subsidy payments totaling some $143,000. *56 In connection with these efforts, the appeals were more than a futile gesture. On their own merits, however, the appeals were doomed from the outset. See generally Parmelee Transportation Company v. United States,173 Ct. Cl. 139, 351 F.2d 619 (1965). We therefore hold petitioner is entitled to the loss deduction in 1973, the year in which his cotton allotments were canceled. Whether the character of the loss suffered should be capital or ordinary was not argued on brief by either party. At trial, counsel for respondent conceded that any loss allowable in 1973 would be ordinary. Accordingly, we do not address that issue. To reflect concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩