Rainbow Inn, Inc. v. Commissioner.
Rainbow Inn, Inc. v. Commissioner
Docket No. 3652-66.
United States Tax Court
T.C. Memo 1969-217; 1969 Tax Ct. Memo LEXIS 80; 28 T.C.M. (CCH) 1160; T.C.M. (RIA) 69217; October 15, 1969. Filed Robert M. Taylor, for the petitioner. Giles J. McCarthy, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years ending June 30, 1959, 1960, 1961, and 1962 and additions to tax under sections 6651(a) and 6653(a), I.R.C. 1954, [1] as follows: *90 Taxable
Additions to tax
year
Under
Under
ending
Sec.
Sec.
June 30
Deficiency
6651(a)
6653(a)
1959
$ 76.30
0
0
1960
6,894.20
$966.60
$344.71
1961
2,362.05
34.79
0
1962
6,159.07
0
0
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision whether petitioner is entitled to a deduction of $33,013.37 for the taxable year ending June 30, 1962, as an embezzlement loss. If petitioner is entitled to this claimed deduction, net operating *82 loss carrybacks to the taxable years ending June 30, 1959, June 30, 1960, and June 30, 1961, will result. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a New Jersey corporation with its principal place of business both now and at the time of the filing of the petition in this case in Clayton, New Jersey. It filed its Federal income tax returns for the fiscal years ended June 30, 1959, 1960, 1961, and 1962 with the district director of internal revenue at Camden, New Jersey. Petitioner keeps its books and records and files its Federal income tax returns on an accrual basis and for fiscal years ending June 30. Since its incorporation on June 3, 1953, petitioner has been engaged in the retail food and liquor business. Capitalized at $40,000, represented by 40 shares of $1,000 par value common stock, petitioner was owned during the years here in issue 50 percent by Jean Wlodkowski (hereinafter referred to as Jean), 25 percent by Edmund Jezemski (hereinafter referred to as Edmund), and 25 percent by Apolonia Jezemski (hereinafter referred to as Apolonia). Jean was the president and Edmund and Apolonia were vice president and secretary-treasurer, *83 respectively. Apolonia and Edmund have been estranged as husband and wife since 1959, and since that time they have lived separate and apart. Apolonia lived in Nortonville, New Jersey where she operated a tavern under the name, "Conn's, Inc." In November of 1961 Apolonia requested from Jean and Edmund a distribution to her of what she considered to be her share of petitioner's bank deposits. When her request was refused, Apolonia told the other officers that she would get her money. During the taxable years in issue petitioner maintained a checking account at the Clayton National Bank, Clayton, New Jersey. All checks on the account required the signatures of all three of petitioner's officers. Apolonia kept the books of petitioner and attended to its banking details, reconciling the bank statements with petitioner's books. Petitioner's bank issued statements to petitioner, reflecting the following balances in petitioner's account as of the dates indicated: Balance
Date
$46,675.07
January 30, 1962
47,331.71
February 26, 1962
49,733.95
March 23, 1962
42,403.86
April 30, 1962
17,417.21
May 14, 1962
Between February 2, 1962, and May 7, 1962, the following *84 checks totaling $36,513.37, purportedly signed by the three officers of petitioner, were drawn on petitioner's account at the Clayton National Bank: 1161 Date
Amount
Payee
February 2, 1962
$3,500.00
Conn's, Inc.
March 28, 1962
5,000.00
Conn's, Inc.
April 16, 1962
5,000.00
Conn's, Inc.
April 27, 1962
3,500.00
Apolonia A. Jezemski
May 1, 1962
4,370.00
Joseph Durham & Co.
May 6, 1962
423.81
Dealers Liquor Co.
May 6, 1962
754.01
Majestic Wine & Liquor Co.
May 6, 1962
1,703.80
Goidstein & Goldstein, Inc.
May 6, 1962
481.75
Imperial Distributing Co.
May 7, 1962
9,500.00
Johnson & A. A. Sitass [1]
May 7, 1962
1,380.00
Nicholas Dentino
May 7, 1962
900.00
Frank DeRenzo
The bank statements of February 26, 1962, and April 30, 1962, were never seen by either Jean or Edmund. When Edmund inquired at the bank about the statements he was told on one occasion that the bank statements would be mailed to him and on another occasion that Apolonia had picked them up. He did not ask the bank to provide him with duplicates. Although the bank statement of March 23, 1962, was seen by *85 both Edmund and Jean, a $3,500 deposit made on March 7, 1962, had been erased from the statement after it left the bank but before it had been seen by them. Edmund did not make an item-by-item check of the statements he did see but merely looked at the balance. Since no running balance or list of deposits was maintained in the checkbook, the monthly bank statements were the only indications available to Edmund and Jean of the condition of petitioner's bank balance. When the bank statement of May 14, 1962, was received by petitioner on May 16, 1962, Edmund noted the large discrepancy between the opening and closing balances and therefore personally examined the checks covered by the statement. Upon discovering that the payees of the checks included persons or companies with whom petitioner had had no business dealings, Edmund, on May 17, 1962, gave notice thereof to the Clayton National Bank. On August 21, 1962, petitioner filed a civil action in Gloucester County Court (New Jersey) against the bank to recover $36,513.37 on the ground that the bank was negligent in honoring the 12 checks heretofore listed. Judgment was entered in favor of petitioner on August 2, 1963, in the amount *86 of $33,013.37. [2] An appeal was taken by the Clayton National Bank to the New Jersey Superior Court, Appellate Division, which, on December 18, 1964, reversed the judgment of the lower court and entered judgment for the Clayton National Bank. The reversal was based on the conclusion by the Appellate Court that petitioner, through its agent, had not exercised due diligence to discover the forgery and report the same to the bank as required by statute. On December 3, 1962, the Clayton National Bank filed a forgery complaint against Apolonia. She pleaded guilty to 11 counts of uttering forged checks, which were 11 of the checks heretofore listed. On August 15, 1963, she was found guilty, fined $1,000 and sentenced to an indefinite term in the Women's Reformatory at Clintwood, New Jersey. The sentence was suspended and Apolonia was placed on 3 years probation. On December 12, 1963, J.E.A. Corporation was duly incorporated under the laws of the State of New Jersey with Jean, *87 Edmund and Anthony Wlodkowski holding equal shares. The corporation was formed for the purpose of acquiring and taking over Rainbow Inn and to purchase the goodwill, licenses and all other assets and assume the liabilities of that business. On January 10, 1964, J.E.A. Corporation purchased all assets of petitioner for $62,000, represented by promissory notes of the new corporation. For the taxable year ending June 30, 1962, petitioner had paid-in or capital surplus of $5,472.62, earned surplus and undivided profits of $13,028.88 and capital stock of $40,000. Petitioner has never declared or paid any dividends. Petitioner has never been reimbursed for the $33,013.37 withdrawn from its account by the forged checks. In 1962, Apolonia had several large loans outstanding from the Clayton National Bank for which she had pledged her shares in petitioner. Payments due on those loans were in arrears on May 17, 1962. 1162 Apolonia had also borrowed the amount of $7,787 from petitioner. She had not repaid this loan although she had been asked to do so. Petitioner on its Federal income tax return for its fiscal year ended June 30, 1962, claimed a deduction in the amount of $33,013.37 *88 as an "embezzlement loss." As a result of this claimed deduction, petitioner showed a net operating loss for its fiscal year ended June 30, 1962, which it claimed and was tentatively allowed as a net operating loss carryback to its fiscal years ended June 30, 1959, 1960, and 1961. Respondent in his notice of deficiency disallowed petitioner's claimed deduction for its fiscal year 1962 for an "embezzlement loss" with the explanation that "* * * it has been determined that the funds withdrawn from corporation by stockholder-officer represented distributions of profits and capital." Respondent's adjustment for petitioner's fiscal year ended June 30, 1962, resulted in elimination of any net operating loss for that year and therefore respondent disallowed the claimed net operating loss carrybacks to the fiscal years ended June 30, 1959, 1960, and 1961 previously tentatively allowed. At the trial respondent stated that he was also contending that during its fiscal year 1962, petitioner had a reasonable chance to recover the amount of the forged checks and for that reason suffered no loss in the fiscal year 1962. With leave of the Court, respondent filed an amended answer so alleging. *89 Ultimate Finding of Fact Until the New Jersey Superior Court, Appellate Division, on December 18, 1964, reversed the judgment of the lower court in favor of petitioner in the suit by petitioner against the Clayton National Bank, there existed a reasonable chance of recovery by petitioner of the amounts paid out by the bank on the checks forged on its account. Opinion Petitioner takes the position that it is entitled to deduct in its fiscal year ended June 30, 1962, the $33,013.37 withdrawn from its account by checks forged by Apolonia under section 165(a) and (e)[3] as a theft "loss sustained during the taxable year and not compensated for by insurance or otherwise." Respondent recognizes that Apolonia's withdrawals from *90 petitioner's account by forged checks is the type of act encompassed within the term, "theft" as used in the statute. Katherine Ander, 47 T.C. 592 (1967). However, respondent takes the position that during its fiscal year ended June 30, 1962, there existed for petitioner "a claim for reimbursement with respect to which there is a reasonable prospect of recovery" and therefore under sections 1.65-1(b) and (d)(2)(i) and section 1.165-8 (a)(1) and (2), Income Tax Regs.[4] the loss is not to be considered as sustained by petitioner in its fiscal year 1962. Respondent further contends that petitioner condoned Apolonia's actions and for that reason 1163 should be considered as consenting to the withdrawals which she made and that the withdrawals were in substance distributions by petitioner of profits and capital to Apolonia. *91 Petitioner argues that it did not have, during its fiscal year 1962, a claim for reimbursement with respect to which there was a reasonable prospect of recovery. Petitioner contends that if on the basis of the facts such a claim is considered to exist, it should nevertheless, under section 165(e), be entitled to deduct the loss in the year the loss was discovered, and that the provisions of section 1.165-1(d)(2)(i) and section 1.165-8(a), Income Tax Regs., that the loss is not to be considered as sustained in the year in which it is discovered if in that year there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, should be held invalid. Petitioner denies that it condoned Apolonia's actions or that the $33,013.37 constituted in substance a distribution of profits and capital to Apolonia. Whether a taxpayer in the year a loss occurs has a claim for reimbursement of the loss with respect to which there is a reasonable prospect of recovery is a question of fact which must be determined from the circumstances present *92 in each particular case. See Louis Gale, 41 T.C. 269 (1963), in which we quoted from and discussed the holding in Scofield's Estate v. Commissioner, 266 F. 2d 154 (C.A. 6, 1959), reversing in part 25 T.C. 774 (1956), that the loss from an embezzlement which occurred over a number of years ending in 1932 and discovered in 1935 was deductible in 1948 when litigation seeking reimbursement from a third party terminated. We pointed out that while the Court of Appeals disagreed with our conclusion as to reasonableness of the taxpayer's prospects of recovery, it did not disagree with the criterion we applied in determining that fact or with our view that the deductibility of the loss in the year of the termination of the litigation was dependent upon whether a reasonable prospect of recovery existed until such later year. In the instant case petitioner immediately upon discovery of the forgery on May 17, 1962, notified the bank and in August of 1962 filed a suit against the bank. It is clear, therefore, that in its fiscal year ended June 30, 1962, there existed for petitioner "a claim for reimbursement" with respect to the forgery losses from the bank. *93 The evidence indicates that in its fiscal year 1962 petitioner had a claim for reimbursement against Apolonia. We must determine from the circumstances of this case whether during its fiscal year 1962, there was "a reasonable prospect of recovery" with respect to petitioner's claims. Although the institution of a lawsuit is relevant in determining whether there exists a reasonable prospect of recovery, the mere existence of a pending action seeking recovery is not in and of itself sufficient to defeat the deduction claimed. Cf. Gottlieb Realty Co., 28 B.T.A. 418 (1933) with Katherine Ander, supra. In Gottlieb Realty Co., supra, we held that the existence of a suit filed to recover misappropriated funds from the defalcating officers and directors of the petitioning taxpayer was not sufficient to bar the deduction where the financial condition of the defendants was such that no recovery could be realistically expected. Just as the mere existence of a suit *94 is not, of itself, sufficient in every case to indicate a reasonable prospect of recovery, the ultimate failure to recover under such a suit is not sufficient to brand a taxpayer's prospects of recovery as having been unreasonable. Therefore, although the existence of a cause of action, or a pending suit, should be given weight in determining the taxpayer's chances of future recovery of a purported loss, the strength of petitioner's claim must be judged in the first instance on its own merits, independent of the legal steps taken by petitioner. In the instant case any claim petitioner had against Apolonia was not encouraging of recovery. All the evidence indicates that she had many large outstanding debts, and had pledged her stock in petitioner to the bank to cover loans made to her. Although her connection with "Conn's, Inc." is stressed by respondent, the indication from the record is that Conn's, Inc. was not in a strong position financially. In light of these facts, we consider that petitioner did not have any reasonable chance of recovery from Apolonia. 1164 At the time the loss was discovered, however, petitioner, had, and subsequently elected to pursue, a cause *95 of action against the bank to recover moneys paid on the forged signatures. New Jersey Statutes Annotated, 17:9A-226 (A) provides a 2-year statute of limitations within which a depositor must notify the bank in writing of his forged signature. NJSA 17:9A-226(C) goes on to provide, however, that a banking institution shall not be liable to a depositor for payment of a check on which the signature was forged if the bank shall establish that the depositor failed to act with due diligence in discovering and giving notice of such forgery to the bank. [5] No New Jersey case had established the relationship between NJSA 17:9A-226(A) and NJSA 17:9A-226(C) as of June 30, 1962. Also the factual situation here was such that it appears that there was a reasonable prospect that the bank could not establish that petitioner failed to exercise reasonable diligence in discovering the forgery and giving notice thereof to the bank. Moreover, the fact that petitioner in this case prevailed against the bank at the trial level would indicate that the law in New Jersey was at least arguable until the Appellate Court *96 rendered its decision. [6] In spite of the fact that petitioner ultimately lost its case against the bank, in light of the trial court's decision below, and the unsettled nature of the statutory relationships between the two sections of the statute, we conclude that there existed at the time petitioner discovered the forgery and at the time petitioner instituted its suit against the bank a reasonable prospect of recovery by petitioner from the bank. *97 Since petitioner has failed to show it had no reasonable prospect of recovery of the funds during its fiscal year 1962, we find that petitioner did not sustain its loss in its fiscal year ended June 30, 1962, under the provisions of sections 1.165-1 and 1.165-8 Income Tax Regs.
Petitioner challenges the validity of the cited regulations on the ground that they are in conflict with the Congressional intent of the statute as written. It is petitioner's position that the Code section predicating a deduction on a loss "not compensated by insurance or otherwise" was not intended to be extended to cover a theft loss to which section 165(e) applies, where the prospects of recovery from reimbursement are from the wrongdoer or a third party. The legislative history of section 165(e) indicates that it was designed to eliminate the problem occurring under the predecessor section of a taxpayer sustaining a theft loss which would not be discovered until after the statute of limitations had run with the resultant denial of the deduction in the year in which the loss was sustained. See H. Rept. No. 1337 to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. p. 21 (1954). There is, however, *98 nothing in the legislative history to imply that a change in the method of determining whether a loss had been sustained was contemplated. Section 1.165-8, Income Tax Regs., which provides that a theft loss does not result in a deductible loss as long as there is a 1165 reasonable prospect of recovery through compensation by insurance or otherwise, is not invalid since it merely implements the statutory scheme by reasonably defining the circumstances of loss. We have approved this regulation with respect to theft losses in John H. Schacht, 47 T.C. 552 (1967), and Katherine Ander, supra.Petitioner has presented no argument which persuades us to change our view of the validity of this regulation. See the discussion of the history of section 1.165-1(d)(2) (i) in Louis Gale, supra, at 273-275. Since we have found sections 1.165-1 and 1.165-8, Income Tax Regs., to be valid and that petitioner is not entitled to a deduction for a theft loss under these regulations for its fiscal year 1962 because it had a reasonable chance of recovery until 1964, we need not consider the other contentions made by respondent. Decision *99 will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
1. Sitass was the maiden name of Apolonia Jezemski.↩
2. The trial court apparently considered the deposit on March 7, 1962, which was erased from petitioner's bank statement to have been made by Apolonia to cover the check for $3,500 drawn on February 2, 1962.↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (e) Theft Losses. - For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
4. Sec. 1.165-1(b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss. * * * (d) Year of deduction. * * * (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release Sec. 1.165-8 Theft Losses. (a) Allowance of deduction. (1) Except as otherwise provided in paragraph (b) of this section, any loss arising from theft is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. See section 165(c)(3). (2) A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. See section 165(e). Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of section 1.165-1↩.
5. NJSA 17:9A-226. Forged, altered and unauthorized instruments; commercial accounts. A. No banking institution shall be liable to a depositor for an amount charged to or collected from him because of the payment by the banking institution of a check, note, acceptance or other instrument for the payment of money upon which the signature of the depositor was forged, or which was made, drawn, or accepted without authority, or which was raised or otherwise materially altered, unless, within two years after the return of such instrument to the depositor, he shall notify the banking institution in writing that his signature was forged or that the instrument was made, drawn, or accepted without authority, or that it was raised or otherwise materially altered. * * * C. No banking institution shall be liable to a depositor for an amount charged to or collected from him because of the payment by the banking institution of a check, note, acceptance or other instrument for the payment of money upon which the signature of any party was forged, or which was raised or otherwise materially altered, if the banking institution shall establish (1) that the depositor failed to exercise due diligence in discovering, and giving notice to the banking institution that an amount was charged to or collected from him because of the payment by the banking institution of any such check, note, acceptance or other instrument for the payment of money; and (2) that such lack of diligence contributed to the payment by the banking institution of an amount so charged to or collected from the depositor for the recovery of which the depositor seeks to hold the banking institution liable. * * * This Act was repealed in 1961, effective January 1, 1963, and replaced by the Uniform Commercial Code. ↩
6. The case of Clarke v. Camden Trust Co., 84 N. J. Super. 304, 201 A. 2d 762 (Law Div. 1964), affirmed 89 N. J. Super. 459, 215 A. 2d 381 (App. Div. 1965), cited by the Appellate Court in its decision, holds NJSA 17:9A-226(C) to be a limitation of equal force to NJSA 17:9A-226(A)↩ upon the depositor's right to recover against a bank upon a forged instrument.