GRANT R. BISHOP, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1812–68.    Filed February 3, 1971.

*Roger A. Pott*, for the petitioner.

*Eugene H. Ciranni* and *Joel A. Sharon*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for 1964 in the amount of $35,653.65. The only issues presented for decision are:

(1) Whether payments made by petitioner to his former wife are deductible by him as alimony under section 215;[1] and

(2) Whether the value of the family residence which petitioner agreed, as one feature of a separation agreement, to deed, or cause a corporation to deed, to his wife is taxable to him as a constructive dividend in 1964.

### FINDINGS OF FACT

Grant R. Bishop (hereinafter Grant) was a legal resident of Saratoga, Calif., at the time he filed his petition. He filed a separate Federal income tax return for 1964 with the district director of internal revenue at San Francisco, Calif.

In July 1962, after 15 stormy years of matrimony, Grant and his wife, Beverlee Parker Bishop (hereinafter Beverlee), separated; she remained in the family residence and he moved to an apartment. On February 13, 1963, Beverlee filed a complaint in a California court, seeking a divorce on the grounds of extreme cruelty, custody of their children, an equitable division of the community property, and support payments for herself and the three children, then 13, 9, and 7 years of age, respectively. Grant filed an answer and cross-complaint in the action on April 24, 1963, requesting a divorce, custody of the children, and an equitable division of the community property. During the period of the separation and continuing to April 1964, Grant voluntarily paid Beverlee $1,000 per month for her support and that

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

of the children. In addition, he paid bills and certain other expenses relating to her residence which aggregated approximately $300 to $400 per month.

After the suit was instituted by Beverlee, Grant represented himself for about 6 weeks in negotiations with Colin M. Peters, her attorney, for a property settlement. Grant then retained the services of John M. Burnett (hereinafter Burnett) as his counsel. From the inception of the negotiations, the parties contemplated a division of the community property, together with an allowance for Beverlee's support. During the early stages of the negotiations, the efforts of both parties, through their respective counsel, were directed primarily toward establishing a reasonable value for the community property. Numerous letters were exchanged by the attorneys discussing the values of the various community assets, but no agreement was reached.

The parties finally decided that independent appraisals of the community's worth would be helpful. Beverlee obtained the services of a certified public accountant, who set the net value at $525,528.09. Relying in part on an appraisal of the real property by a third party, Grant placed the net value at $434,007.58. At this stage of the negotiations, Beverlee retained other counsel, Eugene L. Trope (hereinafter Trope), to handle the negotiations on her behalf.

Trope's general objective was "to obtain one-half of the community for the wife and support based upon [the] income capabilities of the manager of the community, or the husband." To aid in accomplishing this objective, he retained Cohen, Hammer & Co., certified public accountants, to appraise the assets of the community. Their report, placing the net value at $707,850, was submitted on March 12, 1964. While this report was being prepared, however, on March 5, 1964, Trope and Burnett tentatively agreed on an integrated "Agreement of Separation, of Property Rights, of Alimony and for Support of Children." The agreement was executed by the parties on March 18, 1964.

Under the terms of the agreement, the following stipulations were made:

(a) All property standing in the name of either of the parties and all property in the possession of either of the parties was community property of the parties under the laws of the State of California.

(b) Beverlee was to have custody of the three minor children of the parties.

(c) Grant was to pay child support to Beverlee in the amount of $125 per month for each child until the child reached the age of 21, or married, or became self-supporting, or ceased to remain in Beverlee's custody. Beverlee was to pay the cost of the college education of the children, provided they have the requisite aptitudes.

(d) Beverlee was to receive (1) the family residence at 19695 Glen Una Drive, Saratoga, Calif., free and clear of encumbrances; (2) a new and fully insured 1964 Chevrolet Impala station wagon with accessories, and (3) the family household furniture, furnishings, silverware, flatware, objects of art, and jewelry.

(e) Grant was to receive the balance of the community property of the parties.

(f) Grant was to pay Beverlee $1,700 per month for a period of 168 months (14 years) provided, however, that if Beverlee remarried after 132 months (11 years) elapsed such payments would stop immediately and provided, further, that if Beverlee remarried before 132 months (11 years) elapsed the payments continued until 132 months (11 years) elapsed.

(g) The right of Beverlee to receive the $1,700 per month payments described above was to continue after Grant's death and was to be enforceable as a claim against Grant's estate.

With respect to the manner in which the property was divided, the agreement contained the following:

It is specifically acknowledged, understood and agreed by and between the parties hereto that the division of community property as between [Grant] and [Beverlee] is unequal in this agreement. This inequality of distribution and division of community property between [Grant] and [Beverlee] is intentionally made as one of the considerations for the payment of alimony and support in the sums and amounts set forth herein * * *. Therefore, the parties hereto specifically acknowledge that the division of community property between them, being substantially unequal, is made and agreed to by [Beverlee] in consideration of the amount of alimony and support to be paid to [Beverlee] pursuant to the terms hereof and in further consideration of the fact that said amounts for alimony and support may never be modified in any respects whatsoever except as specifically set forth herein in this paragraph.

After this agreement was reached between the parties, it was submitted to the court in connection with the divorce proceedings. The court incorporated by reference the terms of the agreement in its interlocutory decree of divorce entered on April 3, 1964. The divorce became final on May 5, 1966.

Both parties received advice on the tax consequences of the agreement, and for the years 1964, 1965, and 1966 each party consistently created the $1,700 monthly payments as alimony, i.e., Grant deducted the payments and Beverlee included them in her income. Beverlee later filed amended returns, claiming the payments were installments on the purchase price of her share of the community property.

At all times during the negotiations, Beverlee was concerned with obtaining her fair share of the community assets; however, with the exception of the residence and its furnishings, valued at about $95,000, he did not want any of the community assets themselves. Many of

the household furnishings and a portion of the cost of the family residence had been given to the couple by Beverlee's parents. Consistent with Beverlee's desire to receive her fair share of the community assets, the separation agreement provided that:

If at any time in the future it is discovered that [Grant] owned any right, title or interest in any property, real or personal, not described * * * [in the agreement], any such property not so listed and described shall be awarded to [Beverlee] as her separate property and estate.

At the time the agreement was signed, title to the family residence which Beverlee was to acquire as one feature of the settlement was held by Los Gatos Securities, Inc. (hereinafter Los Gatos), a corporation wholly owned by the community. The separation agreement provided that "as between the parties * * * the family residence * * * is hereby declared to be the community property of the parties." It further provided that Grant would "deed or cause to be deeded" the residence to Beverlee, free and clear of all encumbrances, within 14 days of the date of the execution of the agreement. The residence was not conveyed to her at that time. It was subject to a mortgage which was not removed until February 1966, and title was then transferred to Beverlee. During this period, while title remained in the corporation, Grant paid Los Gatos $300 per month as rent for Beverlee's use of the residence.

Beverlee continued to live in the family residence from the time of the final separation in 1962 until August 1965. After the separation agreement was signed and the interlocutory decree of divorce was entered in April 1964, she paid all the costs of operating and maintaining the house, as well as insurance on it and its furnishings, except that Los Gatos paid the property taxes for 1964 and 1965.

The Commissioner determined that the payments of $1,700 per month were installment payments on "the purchase price of [Beverlee's] interest in the community property" and were not alimony. He also determined that in 1964 the residence was constructively distributed by Los Gatos to Grant and that the distribution is taxable to him as a dividend.

### ULTIMATE FINDINGS OF FACT

The monthly payments by Grant to his former wife in the amount of $1,700 during 1964 were alimony within the meaning of sections 71 and 215 to the extent of $1,000 and capital investments for the acquisition of part of her share of the community property to the extent of $700.

Los Gatos continued to own the Glen Una Drive residence during

1964; its ownership was not transferred either to Beverlee or Grant during that year.

OPINION

The first issue is whether, within the meaning of section 71,[2] Grant's monthly payments were made "in discharge of * * * a legal obligation which, because of the marital or family relationship," was imposed upon him by the separation agreement and divorce decree. Payments of this character, commonly known as alimony, are includable in the wife's income and, by reason of the companion provisions of section 215,[3] are deductible by the husband. Respondent has determined that Grant's payments were made as part of the purchase price for Beverlee's share of the community property rather than alimony, and, consequently, are not deductible in computing his 1964 tax.

The determination of the purpose for which the payments were made depends upon all the facts and circumstances of the case rather than upon the labels used in the agreement to describe the payments. See *Bardwell* v. *Commissioner*, 318 F.2d 786, 789 (C.A. 10, 1963), affirming 38 T.C. 84 (1962); *Blanche Curtis Newbury*, 46 T.C. 690, 694 (1966); *Thomas E. Hogg*, 13 T.C. 361 (1949). Significantly, the text of section 71 does not use the word "alimony" but refers to legal obligations which are imposed because of a marital or family relationship. The regulations amplify the statute by explaining that the section applies only to payments made because of such relationship and in recognition of the general obligation of support. Sec. 1.71–1(b)(4), Income Tax Regs.; *Wilma Thompson*, 50 T.C. 522, 528 (1968). In adopting the carefully chosen language of the section, Congress sought to deemphasize the importance of the standards of State alimony laws and to establish uniform treatment of "amounts paid in the nature of or in lieu of alimony regardless of variance in the laws of different States." H. Rept. No. 2333, 77th Cong., 2d Sess., 1942–2 C.B. 427; S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C.B. 568; *Taylor* v. *Campbell*, 335 F.2d 841, 845–846 (C.A. 5, 1964); *Bard-*

---

[2] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

  (a) GENERAL RULE.—

    (1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

[3] SEC. 215. ALIMONY, ETC., PAYMENTS.

  (a) GENERAL RULE.—In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682, the amount thereof is not includible in the husband's gross income.

*well* v. *Commissioner*, *supra* at 789; *Soltermann* v. *United States*, 272 F.2d 387 (C.A. 9, 1959).

One of the objectives of sections 71 and 215 was to relieve the husband of the hardship of paying income tax on amounts otherwise includable in his gross income but expended for the support of a divorced or legally separated wife, and to tax such amounts instead to the recipient wife; however, these sections were not intended to deprive the parties of the opportunity of making a tax-free division of the marital property. *Bardwell* v. *Commissioner*, *supra* at 789; *MacFadden* v. *Commissioner*, 250 F.2d 545, 547 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 968 (1958). The legislative history shows clearly that the wife is not to be taxed under section 71 on the receipt of her own property or its proceeds,[4] and the husband may not deduct under section 215 the capital outlays which he makes to acquire her interest in the property. H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 428; see *McCombs* v. *Commissioner*, 397 F.2d 4 (C.A. 10, 1968), affirming a Memorandum Opinion of this Court; *Campbell* v. *Lake*, 220 F.2d 341 (C.A. 5, 1955); *Lewis B. Jackson, Jr.*, 54 T.C. 125 (1970); *John Sidney Thompson*, 22 T.C. 275 (1954). Where the payments have a dual character—consisting both of payments to discharge the obligation of support and payments to acquire the wife's interest in property—a segregation must be made to ascertain the amount which is deductible by the husband under section 215 and the amount which is a nondeductible capital expenditure under section 263. Sec. 1.71–1(c)(4), Income Tax Regs.; *Riddell* v. *Guggenheim*, 281 F.2d 836, 842 (C.A. 9, 1960); *Soltermann* v. *United States*, *supra* at 388, 390; *Brantley L. Watkins*, 53 T.C. 349 (1969), acq. 1970–2 C.B XXI. The record in the present proceeding convincingly shows that Grant's monthly payments had such a dual character.

In the light of all the evidence, we have found as ultimate facts that $1,000 of the monthly payments was in the nature of alimony and that the remaining $700 was paid to acquire a portion of Beverlee's interest in the community property.

At the time of their separation in 1962, Beverlee, as Grant's wife, had a present right to support. While the separation agreement was being negotiated, Grant discharged his obligation in this respect by making substantial monthly payments. During these negotiations,

---

[4] If jointly owned property is sold by one spouse to another as a feature of the separation or divorce arrangements, capital gain may be realized on the transaction. *Commissioner* v. *Halliwell*, 131 F.2d 642 (C.A. 2, 1942), reversing per curiam a Memorandum Opinion of this Court, certiorari denied 319 U.S. 741 (1943); *Commissioner* v. *Mesta*, 123 F.2d 986 (C.A. 3, 1941), reversing 42 B.T.A. 933 (1940), certiorari denied 316 U.S. 695 (1942); *Aleda N. Hall*, 9 T.C. 53 (1947), acq. 1947–2 C.B. 2. Cf. *United States* v. *Davis*, 370 U.S. 65 (1962).

Beverlee was represented by a competent and experienced lawyer who testified that he sought both support payments and an equitable division of the community property. These negotiations were protracted and bitter, and were accompanied by charges and countercharges of infidelity and bad faith. "It would be unrealistic to hold that she gave up this right to support without consideration and that, as respondent contends, everything she received under the agreement was in exchange for her share of the community property." *Floyd H. Brown*, 16 T.C. 623, 631 (1951), acq. 1951-2 C.B. 2.

We think it equally obvious that Grant has not shown that Beverlee abandoned her claim to her full share of the community property and that everything she received constituted support payments. Both parties expended substantial effort in determining the net value of the community property as a basis for the negotiations. The agreement contains a representation that Grant had made a full disclosure of the community assets and further provides that, if an undisclosed asset is discovered, it shall be awarded to Beverlee. Moreover, under the agreement, the monthly payments are to continue for a minimum of 11 years even though Beverlee remarries, and the liability for the payments would not cease in the event of Grant's death but would be an enforceable claim against his estate; such provisions are persuasive that the payments are part of a property settlement. *Campbell* v. *Lake*, *supra* at 343; *Ann Hairston Ryker*, 33 T.C. 924, 929-930 (1960).

The evidence, we think, overwhelmingly supports our ultimate finding that the payments were not made solely for Beverlee's support or solely for her share of the community property, but, in part, for her support and, in part, for the relinquishment of her property rights. Indeed, the separation agreement recites that it is "specifically acknowledged, understood and agreed" that "the division of community property" is "unequal in this agreement" and that this "inequality of distribution and division of community property" is "intentionally made as one of the considerations for the payment of alimony and support in the sums and amounts set forth herein." It further recites that the "substantially unequal" property division is agreed to by Beverlee "in consideration of the amount of alimony and support to be paid" to her. The residence, furnishings, and automobile which she received had a total value of only about $100,000, whereas the community assets, according to Grant's own appraiser, were worth at least $434,000. Both parties had employed appraisers, were fully aware of this disparity in values, and carried on their lengthy negotiations with full knowledge of their respective rights.

Grant's counsel asks us to ignore these provisions in the separation agreement on the ground that they were inserted in order to make it an integrated agreement, not subject to modification by a subsequent court decree. We recognize this possibility and we do not regard such provisions, standing alone, as decisive. *Ann Hairston Ryker, supra* at 930. All the evidence, however, tends to show that the recitations in this respect merely recorded the true facts, and we think the following comment by the Supreme Court of California on an integrated agreement in *Dexter* v. *Dexter*, 42 Cal. 2d 36, 265 P. 2d 873, 876–877 (1954), is particularly enlightening:

> When, as in this case, * * * the parties have made the provision for support and maintenance an integral part of their property settlement agreement, the monthly payments will ordinarily have a dual character. To the extent that they are designed to discharge the obligation of support and maintenance they will ordinarily reflect the characteristics of that obligation and thus have the indicia of alimony. * * * [Citations omitted.] On the other hand, to the extent that they represent a division of community property itself, or constitute an inseparable part of the consideration for the property settlement, they are not alimony, and accordingly cannot be modified without changing the terms of the property settlement agreement of the parties.

Grant argues, nevertheless, that he had developed evidence which would have enabled him to defeat Beverlee's claim to one-half of the community property under California Civil Code section 146. As in effect in 1964, that statute provided that in the event of a divorce the community property "shall be equally divided between the parties" unless the decree is rendered on the grounds of adultery, incurable insanity, or extreme cruelty; if the divorce is rendered on such a ground, the innocent party may receive more than half of the property. See, e.g., *Hellman* v. *Hellman*, 108 Cal. App. 2d 588, 239 P. 2d 458, 462 (1952).

We do not think, however, that this provision is of material aid to Grant's case. Although his attorney had developed evidence and served interrogatories on Beverlee in an apparent effort to utilize this statute as a negotiating tool, we cannot assume that he would have been successful if put to a court test or that his position was so strong as to have caused Beverlee to forego any substantial part of her property rights in the course of the negotiations. Beverlee's attorney was also charging infidelities on Grant's part, and she had evidence of condonation of her alleged wrongdoing. Moreover, the undisputed fact is that the divorce was granted to Beverlee, on grounds of extreme cruelty, and the decree awarded her custody of the children with Grant's apparent consent. She, too, had grounds for divorce, and where both parties are at fault, the community property must be divided equally. See, e.g., *De Burgh* v. *De Burgh*, 39 Cal. 2d 858, 250 P. 2d 598, 607 (1952).

We now turn to the segregation of the monthly payments between amounts paid for Beverlee's support and amounts paid for her property interests. See *Soltermann* v. *United States, supra; Brantley L. Watkins, supra.* Although the parties have emphasized their extreme positions—Grant contending that the payments were made entirely for Beverlee's support and respondent arguing that they were made solely to compensate her for her property interests—there is substantial evidence that the support payments amounted to $1,000 per month and that the balance was paid for her property interests.

During the period following their separation, while the settlement agreement was being negotiated, Grant voluntarily paid Beverlee $1,000 per month for her support; this arrangement is evidence of the parties' estimate of her needs. *Thomas E. Hogg, supra* at 367; *Julia Nathan,* 19 T.C. 865, 871–872 (1953). It is true that, during this period, Grant also made additional outlays to maintain the residence and to pay certain bills, but, according to the testimony of Grant as well as his attorney, the basic agreement called for monthly payments of $1,000. The additional amounts, we think, represented child support plus expenditures of the kind which Beverlee would be expected to assume when the residence was transferred to her.

Also, in early 1964, an accountant was requested to prepare a computation of the tax effect of alimony at the rate of $1,000 per month, and his computations, presented at a conference of all interested parties, indicated that alimony in that amount would leave the parties with approximately equal after-tax income. The testimony is that subsequently, at some point after Beverlee retained Trope as her attorney, the negotiations took a different turn, i.e., the parties decided on cash payments in lieu of an equal property division. The accountant was then asked to prepare computations on the basis of payments of $20,400 per year or $1,700 per month. The inference is that the additional $700 per month was designed to compensate Beverlee for the relinquishment of her share of the community property other than the residence, furnishings, and automobile.

Moreover, as we view the evidence, Beverlee's share of the community property under the separation agreement was deficient to the extent of approximately $117,000, but much of the property awarded to Grant required good management to give it maximum value. While numerous variables affected the March 1964 value of the promised payments (e.g., discount rate, tax consequences, security, and the possibility of remarriage with the consequent reduction in the term of the payments to 11 years), we think they had a value to her approximately equal to the property rights which she ceded as part of the settlement.

As to the second issue, respondent quite clearly erred in his determination that the Glen Una Drive residence was constructively received by Grant as a taxable distribution from Los Gatos in 1964. At the time the separation agreement was signed, title to the residence was vested in Los Gatos, and all of the stock of that corporation was owned by the community. For the purposes of the settlement, as between the parties, the residence was, nevertheless, declared to be community property and was awarded to Beverlee as her sole and separate property. Grant promised and agreed to deed or cause the residence to be deeded to her within 14 days of the execution of the agreement. The evidence shows, however, that the agreement was not carried out as written in this respect. Although Beverlee continued to occupy the residence, it was not deeded to her until February 1966. In the meantime, Los Gatos paid the taxes on it, received Grant's rental payments for its use, and retained it as a corporate asset. The evidence falls short of showing that the benefits and obligations of ownership passed to Beverlee in 1964 in the manner described in *Ted F. Merrill*, 40 T.C. 66 (1963), affirmed per curiam 336 F.2d 71 (C.A. 9, 1964), on which respondent relies.

Nor do we think the agreement "as between the parties" that the residence is "hereby declared to be the community property of the parties," even though coupled with Grant's promise to deed or cause it to be deeded to her, is sufficient to show a constructive distribution by the corporation. Under these provisions, Grant was free to acquire the residence from Los Gatos in a variety of ways, such as by complete liquidation of the corporation, by partial liquidation, or by purchase. He was not required to obtain it by declaration of a dividend. He took none of these possible steps in 1964, apparently with the acquiescence of Beverlee. All she acquired under the contract was a promise that steps would be taken to vest her with ownership, and that promise was not kept within the prescribed time. Whatever the tax consequences may be in later years, we do not think such promise or anything else in the separation agreement is sufficient to support a finding that Los Gatos constructively distributed the residence in 1964.

*Decision will be entered under rule 50.*