A. J. ROBERTS and PATRICIA ROBERTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent LYLE L. ROBERTS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roberts v. Commissioner
Docket Nos. 705-71, 7837-72, 8225-72.
United States Tax Court
T.C. Memo 1974-175; 1974 Tax Ct. Memo LEXIS 141; 33 T.C.M. (CCH) 750; T.C.M. (RIA) 74175; June 27, 1974, Filed. Stanley J. Burkey, for the petitioners in docket Nos. 705-71 and 7837-72. James S. Witt, III, for the petitioner in docket No. 8225-72. Millard D. Lesch and Darrell D. Hallett, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioners A. J. and Patricia Roberts in the amounts of $791.84, $1,761.69, $2,687.71, and $1,602.91 for the calendar years 1967, 1968, 1969, and 1970, respectively. Respondent determined a deficiency in the Federal income tax of petitioner Lyle L. Roberts in the amount of $558.57 for the calendar year 1970. [1]
The parties have disposed of some of the issues by agreement, leaving for decision whether the monthly cash payments *143 made pursuant to a property settlement agreement and divorce decree by A. J. Roberts during the calendar years 1967, 1968, 1969, and 1970 to his former wife, Lyle L. Roberts, are includable in her gross income for such years as alimony under the provisions of section 71, I.R.C. 1954, [2] and consequently are deductible for such years by A. J. and Patricia Roberts under the provisions of section 215. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners A. J. Roberts (A. J.) and Patricia Roberts, husband and wife, were residents of Tacoma, Washington, at the time of the filing of their petitions in this case. They filed their joint Federal income tax returns for the calendar years 1967, 1968, 1969, and 1970 with the Internal Revenue Service, Tacoma, Washington. Petitioner Lyle L. Roberts (Lyle) was a resident of Tacoma, Washington, at the time of the filing of her petition in this case. She filed her Federal income tax return for the calendar year 1970 with the District Director for the Western Service Center. From October 11, 1947, to August 13, 1965, A. J. and *144 Lyle were married to each other. Two children were born of this marriage who were 16 and 12, respectively, on August 13, 1965, when a decree was entered by the Superior Court for Pierce County, Washington, granting a divorce to Lyle from A. J. In contemplation of their divorce, A. J. and Lyle on April 29, 1965, entered into an agreement designated "Property Settlement Agreement." This agreement provided in part as follows: IT IS AGREED as follows: I That the property of the parties is community property and at the commencement of this action consisted of the following: 1. An equity in the following described property, to-wit: * * * which said property is now being used as the home of the plaintiff. 2. Household furniture and furnishings; 3. Certain bank accounts, accounts receivable, prepaid insurance, prepaid interest, inventory of goods on hand, office furniture and warehouse equipment, together with an equity in the following described property: LOTS Eleven (11) and Twelve (12) in Block 2507, TACOMA LAND COMPANY's FIRST ADDITION TO TACOMA, W.T., as per map thereof filed for record July 7, 1884, in the office of the County Auditor; all of which is subject *145 to certain liabilities, and which property is used in conjunction with the defendant's business under the firm name and style of Utilities [sic] Supply Company, a sole proprietorship; 4. A Hammond Organ; 5.1954 Chevrolet; 6. 1965 Bonneville Pontiac; 7. 1965 [sic] Chrysler stationwagon; 8. 1962 International truck; 9. a fiber-glass boat with two outboard motors; 10. Certain property including two savings accounts of $1,000.00 each, and a $1,000.00 endowment insurance policy on the life of each of the minor children of the parties, which said property is held in trust by the parties for the benefit of the minor children. 11. Life insurance on the life of the defendant as follows: National Life Insurance Company, Policy No. 1107444, face value Ten Thousand Dollars ($10,000.00); and Manufacturers Life Insurance Company, Policy No. 1, 805, 206, face falue [sic] Fifty Thousand Dollars ($50,000.00). II The plaintiff shall have as her sole and separate property the following: (a) The family home at 7803 Berry Place, Tacoma, as more particularly described in Paragraph I hereof, subject to the following terms and conditions: Plaintiff shall place the home *146 on the market for sale at such price as she deems appropriate. From and after the date hereof, until April 30, 1966, or until the home is sole, whichever is sooner, the defendant will pay to the plaintiff the sum of $100.00 per month to assist in the mortgage payments, the balance to be paid by plaintiff. From the net proceeds of sale defendant shall be repaid all $100.00 monthly payments made by him after the date hereof and the defendant shall likewise receive the sum of $2,000.00 or one-half of the balance of the net proceeds, whichever is smaller. If the home is sold upon terms other than for cash, out of any moneys payable to plaintiff, defendant shall first be repaid the $100.00 monthly payments made after the date hereof, and after repayment of such sums to defendant, the balance shall be divided between the parties in accordance with their respective interests in the remaining equity as above provided. (b) The household furniture and furnishings. (c) The 1954 Chevrolet. (d) Two Hundred Dollars ($200.00) per month for a period of ten years and two months, which said payments shall be property division and not support or alimony and shall be made in periodic payments *147 commencing with the entry of the decree herein. (e) Her personal effects, clothing and jewelry. (f) One-half the 1964 income tax refund. III The defendant shall have as his sole and separate property all the rest, residue and remainder of the property of the parties, including all interest in the business known as Utility Supply Company, and the equity in the real property described in Section 3 of paragraph-I hereof, and including all the rights and interests accrued or to be accrued incident to his employment and all right, title and interest in and to retirement programs, Federal Insurance Contributions Act programs and the like, irrespective of its amount, kind and nature, together with his personal effects, clothing and jewelry and any sporting equipment and tools, but excepting the life insurance policies on his own life and the savings accounts and endowment policies for the children for which provision is made herein. IV Life Insurance: The following policies of life insurance; namely: National Life Insurance Company, Policy No. 1107444, face value Ten Thousand Dollars ($10,000.00); Manufacturers [sic] Life Insurance Company, Policy No. 1, 805, 206, *148 face value Fifty Thousand Dollars ($50,000.00), shall become the sole and separate property of the defendant herein, subject, however, to the following: The defendant shall make the plaintiff and the minor children of the parties hereto the irrevocable beneficiaries of the above insurance policies upon the following terms and conditions: Defendant agrees to keep in force said policies or so much thereof as may be necessary from time to time to meet defendant's obligations herein to the plaintiff and for the support of his minor children. * * * V Alimony: The defendant shall pay to the plaintiff the sum of One Hundred Dollars ($100.00) per month for a period of six (6) years from the date hereof as alimony which alimony payments shall cease automatically upon plaintiff's remarriage and shall be subject to modification by the court upon defendant's application in the event of plaintiff's employment or defendant's inability to pay. * * * VII Support of Minor Children: (a) The defendant shall pay the plaintiff for each child whose custody is awarded to her, the sum of One Hundred Dollars ($100.00) per month, first payment thereof to be due and owing of the first of *149 the month immediately following the entry of a decree of divorce between the parties hereto and said payments shall continue until such child reaches the age of twenty-one years, remarries or becomes self-supporting, which ever contingency first occurs. * * * XI Taxes: The plaintiff agrees to assume and to pay any and all taxes, State and Federal, upon the monies received by her hereunder, including alimony payments under Paragraph V and amounts received under Paragraph II(e) hereof [corrected by agreed corrective order to read II(d)]. XII Trust Property: The endowment insurance policies for $1,000.00 on the life of each child of the parties and the $1,000.00 savings accounts set up in trust for each child of the parties are and were intended for their college education. Such policies shall be maintained by the defendant for such children and savings accounts retained intact for said children and may be used for their college education * * *. If the children or either of them do not enter college, or having entered college, do not desire to complete their education before reaching twenty-one years of age, the insurance proceeds and savings accounts or so much thereof *150 as shall remain shall be divided between each party. * * * XVI IT IS MUTUALLY AGREED by and between the parties hereto that the within division of property is made without consideration of fault; that the plaintiff and defendant understand and acknowledge the amount, extent and value of the property of the parties and each acknowledge that the within Agreement is fair, equitable and just. Each party hereto shall hereby release and discharge the other from all obligations, claims, rights and duties arising or growing out of said marital relationship, * * * The Superior Court of Washington approved and incorporated in the divorce decree the "Property Settlement Agreement." The decree additionally provided Lyle was to have custody of the two minor children but relieved A. J. from the obligation to pay $100 per month support payments for any period his son resided with him. The sole proprietorship business, Utility Supply Company, had been started by A. J. in 1959 and the building which was used by him in the business had been purchased in 1962 for $36,000. The 1964 Pontiac, the Chrysler stationwagon, and the 1962 truck were used in the business. Although the Chrysler *151 stationwagon is listed in the divorce decree as a 1965, it appears on a balance sheet as of December 31, 1963, as encumbered by a 24-month note, so it apparently was a 1963 Chrysler. The $50,000 life insurance policy referred to in the property settlement agreement was a term policy. When the attorney for A. J. and the attorney for Lyle first began to discuss a property settlement in 1964, they had available and relied on a statement of assets and liabilities of A. J. and Lyle as of December 31, 1963, including both personal and business assets, which showed a total combined net worth of $36,125.38. Later, before the discussions were concluded and the basis of the property settlement agreement reached, A. J.'s accountant prepared a statement of the total community assets and liabilities as of December 31, 1964, which showed the following: ASSETS Current Assets
Cash in National Bank of Washington - regular account
$ 1,187.90
Cash in National Bank of Washington - savings account
3,149.49
Cash in National Bank of Washington - tax reserve account
3,884.97
Cash in American Savings and Loan - savings account
1,740.37
Accounts receivable
68,765.30
Inventory
33,507.06
Prepaid interest
377.78
Prepaid insurance 118.66
Total current assets
$112,731.53
*152 Fixed Assets
Cost
Accumulated Depreciation
Balance Building
$36,000.00
$ 4,950.00
$31,050.00
Warehouse equipment
1,417.52
1,120.22
297.30
Office furniture
4,025.03
1,522.54
2,502.49
Automobiles
9,968.62
4,933.22
5.035.40
Real estate
38,500.00
--
38,500.00
Furniture - residence 9,700.00
--
9,700.00
99,611.17
$12,525.98 87,085.19
Other Assets
Bid deposits 250.00
$200,066.72 LIABILITIES AND CAPITAL
Current Liabilities
Accounts payable
$ 86,050.67
Contract payable
560.28
Notes payable - Don D. Demick - current portion
3,180.00
Note payable - National Bank of Washington (Note 1)
1,011.60
Notes payable - National Bank of Washington (Note 2)
2,837.94
Note payable - National Bank of Washington (Note 3)
10,000.00
Note payable
15,000.00
Business and payroll taxes payable 2,261.64
Total current assets
120,902.13
Long-Term Liabilities
Notes payable - Don D. Demick (Note 4)
$31,287.58
Less current portion - above 3,180.00
Long-term portion
28,107.58
Mortgage payable - American Savings and Loan Association (Note 5) 19,375.90
Total long-term liabilities
47,483.48
Capital
A. J. Roberts, capital, January 1, 1964
36,125.38
Add: Net income
15,253.69
Contribution adjustment
50.00
Investment credit adjustment 104.79
Total
51,533.86
Less drawings 19,852.75
31,681.11 $200,066.72
*153 Note 1 - Note secured by 1962 International Truck Note 2 - Note secured by 1964 Pontiac Note 3 - 90-day renewable note, interest at 6 1/2% Note 4 - Secured by building, 2250 Holgate street Note 5 - First mortgage on residence The item of real estate, $38,500, referred to A. J.'s and Lyle's personal residence. This item and the item of furniture-residence of $9,700 were listed at the same amount on the December 31, 1964, balance sheet as on the December 31, 1963, balance sheet, but the mortgage on the residence was shown as $20,142.35 on the December 31, 1963 balance sheet. The items of assets and liabilities were the same on both balance sheets but in differing amounts, except that the $15,000 note did not appear on the December 31, 1963, balance sheet and the 90-day $10,000 note to the National Bank of Washington did not appear on the 1963 balance sheet. Both accounts receivable and inventory were substantially higher in 1964 than in 1963. At the time of the property settlement agreement, A. J.'s and Lyle's equity in their residence was between $12,000 and $18,000. The value of the furniture granted to Lyle was approximately $2,000 and the value of the 1954 Chevrolet *154 granted to her was approximately $200. In late 1971 Lyle sold the residence for $38,000. At the time the property settlement agreement was entered into, the value of the Hammond organ which A. J. obtained was approximately $3,000 and the value of the fiberglass boat with the two motors was approximately $1,000. A. J. subsequently sold the boat and motors for $500. The tools which were granted to A. J. as a part of his personal property consisted of electric tools, saws, and a dual press. When A. J. went into business for himself in 1959, as the sole proprietor of the Utility Supply Company, he purchased for about $2,000 the utility supply part of Demmick Electric Supply Company, a business for which he had worked since 1950. The assets purchased consisted of a small amount of inventory, some existing contracts with municipal utilities and public utility districts, and some exclusive specialized lines of supply of various manufacturers. These arrangements with manufacturers were subject to withdrawal by the manufacturers. During the years from 1959 until about April 1964, the business was substantial a personal service business. A. J. was the only salesman. At first, his *155 only employee was a part-time secretary. A. J. would submit bids to utilities and if the bids were accepted he would have the supplies shipped directly from the manufacturer to the buyer. Consequently he maintained little inventory, and much of the inventory which he had was on consignment. After A. J. bought the building located on Hogate Street from Demmick in March 1962 for $36,000 he employed a full-time secretary and a warehouseman to assist him. By December 31, 1963, his inventory amounted to $13,246.14. During the years 1959 and 1960, the proprietorship averaged $20,000 a year net profits. The net profits were $23,000, $21,000, and $16,428.90 for the years 1962, 1963, and 1964, respectively. In March or April 1964 a salesman, Karamatic, was hired by A. J. to assist him. Karamatic's specialty was in a different line of electrical equipment and he was involved in selling electrical products to contractors and retailers. This addition to the business necessitated a different type of product which resulted in an increase in inventory to $33,507.06 by December 31, 1964. Karamatic received a salary of $12,000-$14,000 plus expenses during 1964. During 1964 lending institutions *156 refused to loan any more funds to the business and A. J. operated to some extent on credit extended to him by two or three of his suppliers. He also obtained $15,000 from a personal loan made to him by a friend, which amount he used in the business. His inventory during 1964 was inadequate. In many instances he was unable to take advantage of discounts offered to him in 1964 and he was unable adequately to extend his lines of supply. State regulations governing purchasing methods of public utilities were promulgated which adversely affected the business in 1964. Karamatic's side of the business of selling to contractors and retailers had not proven itself profitable in 1964. A. J.'s marital difficulties were partially the cause of the declining profits of the business in 1964. Between January 1, 1965, and August 31, 1965, the business improved. Gross receipts were $754,960.96 and the cost of goods sold was $674,511.92, resulting in a gross profit of $80,449.04. Total business expenses were $46,520.37, resulting in a net profit of $33,928.67. Although sales and profits varied on a month-to-month basis, A. J. realized his business was doing better during 1965 than it did *157 in 1964 but was unaware of the extent of the improvement until late August. Karamatic's sales to contractors and retailers by 1965 was having a favorable impact on the profits of the business. The direction of the business was changing from A. J.'s being a sales representative of various manufacturers to a wholesale electrical outlet for contractors and retailers. On August 31, 1965, the business was incorporated as the Utility Supply Co., Inc. A. J. owned all the stock and was the only officer of the company until September 1968 when he sold between 10 and 20 percent of the company's stock to Karamatic who at that time became an officer of the company. At the time of the incorporation of the business, A. J.'s accountant prepared a personal net worth statement for A. J. which was used in obtaining a small business loan for the corporation. This statement showed A. J.'s net worth as $10,500, $7,200 in checking and savings bank accounts and $3,300 in stock in the business. The real property which A. J. did not transfer to the corporation was shown as encumbered to the extent of its net book value. This valuation did not take into consideration A. J.'s liability to pay the $100 *158 and $200 monthly periodic payments under the property settlement agreement. In fiscal year 1965-1966 the corporation had gross receipts of $1,056,475.56 and the cost of goods sold was $932,995, leaving a gross profit of $123,480.56. Total business expenses were $98,169.23 which included A. J.'s salary of $24,200. Net profit was $25,311.33 before taxes. In fiscal year 1966-1967 gross receipts of the corporation were $1,288,251.62 and the cost of goods sold was $1,138,885.86, resulting in a gross profit of $149,365.76.Total business expenses were $121,835.17 which included A. J.'s salary of $27,000, leaving a net profit of $27,530.59 before taxes. In fiscal year 1968-1969 gross receipts of the corporation were $2,800,513.72 and the cost of goods sold was $2,511,306.98, leaving a gross profit of $289,206.74. Total business expenses were $224,004.48 which included A. J.'s and Karamatic's salaries which aggregated approximately $67,200. The net profit before taxes was $65,202.26. In fiscal year 1969-1970 the corporation had gross receipts of $2,871,975.13 and the cost of goods sold was $2,564,641.71, leaving a gross profit of $307,333.42. The total business expenses were *159 $264,451.19 which included $76,257.50 for A. J.'s and Karamatic's salaries. The net profit before taxes was $42,882.23. After the business was incorporated, two salesmen in addition to Karamatic and additional office employees were hired. North Pacific Bank extended loans to the company and the business' working capital increased. Consequently the business was able to carry a larger inventory. The business broadened its operations to include selling electrical products wholesale as well as representing manufacturers. The sales to contractors and retailers developed to equal the sales to utilities. Neither A. J. nor Lyle participated personally in the negotiations leading to the property settlement agreement. At the beginning of the negotiations Lyle's attorney represented to A. J.'s attorney that he considered the business to have value in excess of its book value, but after he became better informed as to the community assets concluded that the business was worth only its book value which was not in his opinion very much. A. J.'s representatives believed at the time the agreement was signed that the business was worth book value as Karamatic's contribution to the business *160 was not then apparent and the net profit for 1965 was uncertain. A. J. did not consider the business to have much value in April 1965 and was concerned that he might be unable to keep his business because of its poor financial condition. Lyle did not know the value of the business and relied on her attorney. She wanted a divorce and a fair settlement. Lyle's attorney insisted that the $200 per month periodic payment be characterized as a division of property and not alimony to foreclose any alteration by the state divorce court of this stipulated amount and to ensure that this amount would be paid irrespective of A. J.'s death, Lyle's remarriage, or the change in financial circumstances of either of them. Lyle, in answer to a question of the Court, stated during the divorce proceeding that she agreed that she was to pay any Federal taxes upon the $200 periodic payments. The understanding of the tax treatment of the $200 periodic payment was the basis of a slightly larger amount to be paid to Lyle being agreed upon by the parties than would otherwise have been stipulated between them. During 1964 A. J. gave his wife $800 per month as he was living apart from her at that *161 time. A. J. and Patricia Roberts on their joint Federal income tax returns for the calendar years 1967, 1968, 1969, and 1970 deducted from their reported income amounts as alimony payments which included the $200 per month paid by A. J. to Lyle under the property settlement agreement. Respondent in his notices of deficiency increased their reported incomes by $2,200, $2,400, $2,400, and $2,400 for the calendar years 1967, 1968, 1969, and 1970, respectively, explaining that these amounts were not includable as alimony in Lyle's gross income under section 71 and accordingly not deductible by them under section 215. Lyle reported on her Federal income tax return for the calendar year 1970 the amount of $3,877.28 but did not include the $200 monthly payments she received from A. J. in her taxable income, explaining on her return that "[taxpayer] received the sum of $200.00 per month from her husband which was determined to be property settlement and in turn not taxable since it was a division of previously taxable income." Respondent in his notice of deficiency to Lyle increased her income as reported by the $2,400 she received from A. J. under the property settlement agreement *162 on the basis that this payment in the year 1970 was alimony, includable in her gross income under section 71. OPINION Section 71(a) (1)[3] and the regulations thereunder provide that if a wife is divorced or legally separated from her husband she must include in her gross income periodic payments received by her in discharge of a legal obligation arising out of the marital relationship in recognition of the general obligation to support and "imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation." Section 215(a) [4] provides that a husband may deduct from his taxable income such periodic payments included under section 71 in the gross income of his wife. However, where there is a division of property of the parties to a divorce and the husband as part of a general settlement makes payments in satisfaction of the wife's property rights, the amounts received by the wife are capital in nature and are neither includable in her gross income under section 71 nor deductible by the husband under section 215. Lewis B. Jackson, Jr., 54 T.C. 125, 129 (1970); Section 1.71-1(b) (4) and section 1.71-1(c) (4), *163 Income Tax Regs.
Lyle contends the $200 monthly payments *164 received by her are not includable in her gross income as the payments represent part of her one-half share of the community assets and do not represent the discharge of an obligation incurred by her former husband because of their marital relationship. [5]
A. J. contends that $200 monthly payments made to Lyle are includable in her gross income and deductible by him as they necessarily constituted his obligation to support, no property being distributed to him by the property settlement agreement or divorce decree representing this value, relying on Bardwell v. Commissioner, 318 F.2d 786 (C.A. 10, 1963), affirming 38 T.C. 84 (1962); Blanche Curtis Newbury, 46 T.C. 690 (1966); and Thomas E. Hogg, 13 T.C. 361 (1949). A. J. argues that the label of "property division" attached to the $200 periodic payments was inaccurate as the language *165 was chosen solely to avoid any future modification of the agreement by the divorce court. He stated that in Washington an amount designated in a separation agreement as alimony remains under the divorce court's jurisdiction but an amount designated as property division does not. Messersmith v. Messersmith, 68 Wash. 2d 735, 415 P.2d. 82 (1966). He contends that the facts and circumstances here present show that the intent of the parties in entering into the agreement was for the $200 monthly payments to discharge his marital obligation to support Lyle and therefore the description of the payments by the parties is not controlling. Grant R. Bishop, 55 T.C. 720 (1971). Additionally A. J. urges that the tax consequences as specified in the agreement are probative of the parties' intent that the nature of the payments were in satisfaction of Lyle's rights to support. Respondent on brief argues in favor of Lyle and against A. J., but does not concede that Lyle properly excluded the $2,400 from her income in 1970. Respondent contends that the $200 periodic payments constitute a division of property. Specifically he argues that these payments were for Lyle's *166 share of the Utility Supply Company, a community asset which he contends had substantial value. The terms and form of the property settlement agreement are emphasized by respondent as demonstrating the intent of the parties that these payments were in satisfaction of Lyle's property interest in the business and not her support rights, relying on Campbell v. Lake, 220 F.2d 341 (C.A. 5, 1955), and Ernest H. Mills, 54 T.C. 608 (1970), affirmed 442 F.2d 1149 (C.A. 10, 1971). Respondent contends that the fact that the sum of $24,400 was fixed and payable irrespective of A. J.'s death, Lyle's remarriage, or the financial circumstances of either of them, indicates that the payments are for a property division and establish the intent of the parties to provide for a division of property, relying on Bernatschke v. United States, 364 F.2d 400 (Ct. Cl., 1966), and Soltermann v. United States, 272 F.2d 387 (C.A. 9, 1959). Lyle argues that the terms of the agreement are controlling and that unless the $200 a month is considered to be in payment of her interest in the Utility Supply Company business she has received nothing for *167 her valuable interest in that business. These monthly payments are clearly "periodic" as they are payable over a period ending more than 10 years from the date of the agreement. [6] None of the parties argue to the contrary. It is equally clear that the $200 payments were a legal obligation incurred by A. J. under the divorce decree which incorporates the written separation agreement of April 29, 1965. The arguments of the parties center solely on whether the disputed payments represent a satisfaction of Lyle's interest in the parties' community property or are in recognition of A. J.'s general obligation of support. This is a question of fact which is determined by consideration of all the facts and circumstances of each case. Blanche Curtis Newbury, supra; Ann Hairston Ryker, 33 T.C. 924 (1960). The labels attached to payments made to a spouse by the separation agreement or divorce decree are not controlling. Ernest H. Mills, supra; Elizabeth H. Bardwell, 38 T.C. 84, 90 (1962), affirmed 318 F.2d 786 (C.A. 10, 1963). Whether the payments terminate on the death of one of the parties or the remarriage of the wife *168 is some evidence of their nature but these factors are not controlling. The intent of the parties as gleaned from all the facts and circumstances in the record is controlling. Pinney v. Mauk, 411 F.2d 1196 (C.A. 5, 1969). *169 Having closely reviewed the record before us we conclude that the amounts of $2,200 in the calendar year 1967 and $2,400 in each of the calendar years 1968, 1969, and 1970 were in substance and were intended by the parties to be payments for Lyle's support in discharge of a legal obligation which was imposed on A. J. because of the marital relationship. The intent of the parties that the payments were not compensation for Lyle's property rights but were in recognition fo her rights to support is indicated by many facts in the record.The record shows that Lyle relied on her attorney to negotiate the property settlement and he estimated the worth of the community assets and reached an apportionment of the assets that he considered granted to Lyle over one-half of the assets and in addition thereto had her receive the $200 per month. A. J. and his attorney both believed Lyle was adequately compensated for her half of the community assets by property other than the disputed $200 payments. The agreement itself did not fix the value of Lyle's share of the community assets transferred to A. J. and the evidence of record is clear that neither the parties nor their representatives considered *170 at the time the agreement was signed that A. J. received any community assets in return for the $200 payments. The record shows no correlation between the $200 monthly payments awarded to Lyle in the separation agreement and the value for any of her one-half share of the community assets transferred to A. J. In fact the record shows that Lyle received over one-half of the community assets plus the $200 monthly payments. We conclude that no part of the $200 monthly payments was for Lyle's property rights. Marion R. Hesse, 60 T.C. 685 (1973); Wilma Thompson, 50 T.C. 522 (1968). Respondent and Lyle argue the intent of the parties and the substance of the payments were compensation for Lyle's one-half share of the business which they urge had a substantial value. On the basis of the record before us, we do not agree. We have set forth the value of the assets received by each party except for the value of the business recieved by A. J. We conclude for reasons hereinafter stated that the value of the business was less than $3,000. Therefore the record shows that Lyle received assets of a value of between $15,000 and $16,000 and A. J. received, including *171 the business, assets of a value of only about $10,000. Using the value of the equity in the house at $15,000, Lyle received $13,000 of this equity and A. J. $2,000 of it. Lyle received $2,000 in furniture and $200 in an automobile, making a total of $15,200. A. J. received, in addition to the $2,000 from the house, $3,000 in an organ, $1,000 in a boat, a nominal amount in tools which was probably offset by personal effects Lyle received, and the value of a $10,000 life insurance policy which the record indicates was nominal, and a $3,000 value in the business, making a total of less than $10,000. Obviously a term life insurance policy, which the $50,000 policy A. J. received was, has no value to the insured. The book value of the business at December 31, 1964, was less than $3,000 and the record indicates that it was little if any more than this amount when the agreement was signed in April. Lyle and respondent refer to "goodwill" as possibly having some value in the business. However, the record shows no goodwill of the business apart from A. J.'s personal contacts. The supplier contracts were cancelable at will and the indication from the record is that these would go with *172 A. J. personally. Neither Lyle nor respondent suggests any other possible asset of the business that would cause its value to exceed book value. The real property had recently been purchased and the record shows it had not appreciated in value between the date of purchase and the date the agreement was signed. The other physical assets were automobiles which the indication is did not exceed book value. The potential earning capacity of the business was speculative in April 1965 and entirely dependent on A. J.'s personal service.The business had had a net income of $20,000 or slightly more a year from 1959 to 1963 inclusive. Until 1965 the actual profits had been declining progressively since 1962 and net income had declined to approximately $16,400 in 1964, partly because of the start-up costs of a new line of business, a deficit in working capital, a lack of credit, an inadequate inventory, and A. J.'s marital difficulties. The net income for the years 1959 to 1964 was mostly compensation for A. J.'s personal efforts as the capital investment in the business was minimal during this time. The record indicates that in the first few months of 1965 sales and net profits improved *173 over the same period for 1964 but even this is not completely clear. For the period January 1 to August 31, 1965, net income was approximately $34,000. For the fiscal years ending August 31, 1966, 1967, and 1968, net income was approximately $25,000, $27,500, and $65,000, respectively, after paying a substantial salary for each such year to A. J. This improvement which resulted from an increase in capital, the success of the previously unproved wholesale electrical business, and A. J.'s unfettered attention to his business, was an unknown factor at the time the property settlement agreement was entered into. The parties' valuation of the business at approximately its book value was reasonable under the facts existing at the time the agreement was signed. In our view their intentions were that the disputed payments were for Lyle's support. The recitations ascribed to by the parties in the agreement with respect to the nature of the $200 disputed payments as a "property division" and to the fairness of the allocation of the community property including the $200 payments have been explained by the evidence. The facts were that the parties intentionally drafted the agreement to *174 reflect an unambiguous property division, by providing separately for "property division" payments and "alimony" payments, to guarantee Lyle's receipt of the agreed-upon $200 periodic payments. A. J. legally bound himself to pay this monthly amount whether Lyle remarried or either of them died. Further, the Superior Court was powerless to modify the amount stipulated even though there was a change in the parties' financial circumstances. Wash. Rev. Code section 26.08.110 (1958). Kinne v. Kinne, 82 Wash. 2d 360, 510 P.2d 814 (1973). It was partially Lyle's attorney's fear that A. J.'s earnings might be so low that he could have an alimony payment reduced that caused him to insist that the $200 be stated as a property division agreement. Campbell v. Lake, supra, and Ernest H. Mills, supra, are distinguishable on their facts as no explanation was offered in either of those cases to demonstrate that the respective parties' intent was other than that agreed to in the property settlement agreements. For the reasons we have stated, we conclude that the monthly payments of $200 received by Lyle in the calendar years 1967, 1968, 1969, and 1970, *175 respectively, were incurred by A. J. "because of the marital or family relationship" in recognition of his general obligation to provide for Lyle's support and therefore such payments constituted alimony within the meaning of section 71 includable in the gross income of Lyle and deductible by A. J. pursuant to section 215. Decisions will be entered under Rule 155. Footnotes
1. Respondent has taken an inconsistent position with respect to his deficiency determinations against petitioners A. J. and Patricia Roberts and petitioner Lyle L. Roberts. ↩
2. All references are to the Internal Revenue Code of 1954. ↩
3. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule. - (1) Decree of divorce or separate maintenance. - If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree of under a written instrument incident to such divorce or separation. ↩
4. SEC. 215. ALIMONY, ETC., PAYMENTS. (a) General Rule. - In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682↩, the amount thereof is not includible in the husband's gross income. 5. There is no issue here with respect to the $100 monthly payments designated in the property settlement agreement as "alimony." Lyle included these amounts in her 1970 income. A. J. deducted these amounts as alimony and respondent did not disallow this part of his claimed deduction for alimony. ↩
6. Sec. 71(c) Principal Sum Paid in Installments. - (1) General rule. - For purposes of subsection (a), installment payments discharging a part of an obligation the principal sum of which is, either in terms of money or property, specified in the decree, instrument, or agreement shall not be treated as periodic payments. (2) Where period for payment is more than 10 years. - If by the terms of the decree, instrument, or agreement, the principal sum referred to in paragraph (1) is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement, then (notwithstanding paragraph (1)) the installment payments shall be treated as periodic payments for purposes of subsection (a), but (in the case of any one taxable year of the wife) only to the extent of 10 percent of the principal sum. For purposes of the preceding sentence, the part of any principal sum which is allocable to a period after the taxable year of the wife in which it is received shall be treated as an installment payment for the taxable year in which it is received. ↩